## JAMES H. JACOBS v. THE COMMONWEALTH.

ERROR TO THE COURT OF OYER AND TERMINER OF LANCASTER COUNTY.

Argued May 14, 1888—Decided October 1, 1888.

Where on the trial of an indictment for murder, it is not set up that the defendant was insane at the time of the homicide, evidence as to his temperament and disposition, the condition of his mind and its characteristics as to excitability, and that there were "controlling influences which at times rendered him incapable of deliberating and premeditating," is inadmissible.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, and CLARK, JJ.; TRUNKEY and WILLIAMS, JJ., absent.

No. 350 January Term 1888, Sup. Ct.; court below, No. 66 January Term 1887, O. & T.

On January 19, 1887, the grand jury returned as a true bill an indictment charging James H. Jacobs with the murder of Elmer Ellsworth Quigley, on December 11, 1886. The plea was, not guilty.

At the trial on October 5, 1887, it was shown that on the

night of December 11, 1886, near ten o'clock, Elmer E. Quigley, a young man of 24 years of age, was going upon an errand along a thoroughfare in Lancaster, and when opposite the dwelling of the defendant his attention was attracted by the screams of children in the defendant's house, and he stopped on the track of a railroad there. Just then, the defendant came out of the house, into the yard, with a dish in his hand. Quigley said something to the defendant about abusing his children, when the latter became angry and said, "Now, I want you to get out of this." A few words were passed, when the defendant said, "Wait, I'll settle you," and ran back into his house, out again into the yard, through the gate, and upon the railroad track, following Quigley up to some obstruction, when he stabbed him in the abdomen with a butcher knife. Quigley had an overcoat upon his right arm the entire time, and dropped it when he fell, a short distance from the place where he received the wound. The night was not dark, and the occurrence was witnessed by several passers-by and residents of the vicinity. Quigley made an ante-mortem statement, and died the next day about 10 o'clock. After the defendant stabbed Quigley, he ran into the house, put the knife in the table-drawer, and for a time concealed himself from arrest.

On the part of the defendant, Dr. Joseph Furness was called, and testified that he was a practicing physician of sixteen years experience and had been well acquainted with the defendant for about two years :

Q. State, if you please, what is the quality and characteristics of the mind of the defendant with regard to its excitability? Objected to by the commonwealth.

By the court: Offer overruled: no plea of insanity has been made, but the plea positively disclaimed by defendant's counsel.[2]

Q. Were you able to judge, from your intercourse with him, what his temperament, disposition and the condition of his mind were? Objected to by the commonwealth.

By the court: Objection sustained.[1]

Q. Please state whether or not, in your judgment, there were such controlling influences in the mind of James H. Jacobs, the defendant, that it was not conscious of its own

purposes, and on account of those influences, incapable of deliberating or premeditating, and if so, what were those controlling influences?

Objected to by the commonwealth.

By the court: Objection sustained.[3]

The court, PATTERSON, J., charged the jury by a review of the facts, full instructions as to the law of homicide and the degrees of the crime of murder under the statute, and proceeded:

The argument and declarations of counsel for the prisoner make the plea of justification for him; justify the deed on the ground of self-defence. That is a good defence if the facts, the circumstances proven, sustain it. The plea of insanity is not made, and it is so expressly stated by the counsel. The task is therefore imposed on us, to present to you the law of self-defence, or justification as stated.

To excuse homicide by a plea of self-defence, it must appear that the slayer had no other possible, or at least probable means of escaping, and that his act was one of necessity. If the slayer use a deadly weapon, and under such circumstances as he must be aware that death will be likely to ensue, the necessity to excuse the homicide, to excuse the killing, must be great and must arise from imminent peril to life, or of great bodily injury. The law of self-defence is a law of necessity, and that necessity must be real, or bear all the semblance of reality, and appear to admit of no other alternative, before taking life will be justifiable or excusable. The plea of self-defence must be made out to the satisfaction of the jury; the prisoner must show an actual necessity for taking life, or a seeming one so reasonably apparent and convincing as to lead him to believe he could defend himself in no other way.

If a party assailed, after having retreated, so as to be free from personal aggression, voluntarily returns and slays the aggressor, the justification of self-defence will no longer avail him. And we will add, that no man can justify taking the life of another, where he deliberately retires from the scene of merely loud words, accompanied with threats to do harm, arms himself with a deadly weapon, and returns to the scene of the former strife, for the purpose of inciting the rage of another

to combat. Killing under such circumstances is either murder in the first or murder in the second degree.

The law fixes no particular period of time to cool, as cooling time. It may be very short, although the provocation may be great, and each particular case is left to the jury under the particular facts and circumstances shown by the evidence. For, however great the provocation or insult which induces the quarrel, if there be sufficient time for the passion to subside and reason to interpose, the killing will then not be voluntary manslaughter, but murder in one or other of the degrees, in the first or in the second degree. To reduce, therefore, an intentional blow, stabbing or wounding, resulting in death, to manslaughter, there must be sufficient cause for provocation, and a state of rage or passion placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed, without time to cool.

But as we have already stated, it is not every cause of provocation that is regarded as sufficient excuse for passion. Insulting or scandalous words are not sufficient cause; nor actual indignities to the person when of a slight or trivial character. It is the general rule of law, that all homicide, all killing of a human creature, is presumed to be malicious; that it is murder of one or the other degree, until the contrary appears in the evidence; and hence the burden of reducing the crime from murder to manslaughter, when it is shown that the prisoner committed the deed, lies on him, on the prisoner; he must show to the jury all the circumstances of alleviation or excuse, upon which he relied to reduce his offence from murder to a milder kind of homicide, unless it should happen that the facts and circumstances proven by the commonwealth establish it. . . . . .

On October 10, 1887, the jury returned a verdict that the defendant was guilty of murder in first degree.

A motion for a new trial was made, entertained, reasons filed, and on January 28, 1888, the defendant being present in open court, the rule granted was discharged, and on motion judgment of execution passed. The defendant then took this writ, assigning as error:

1–3. The refusal of the defendant's offers. [1 to 3]

*Mr. B. Frank Eshleman* and *Mr. J. Hay Brown*, for the plaintiff in error:

At the bottom of all that has been said on the subject of murder in the first degree, is the frame of mind in which the deadly blow is given; that state of mind which enables the prisoner either to know and be fully conscious of his own purpose and act, or not to know. Intelligence is not the only criterion, for it often exists in the madman in a high degree, making him shrewd, watchful and capable of determining his purpose, and selecting the means of its accomplishment. Want of intelligence, therefore, is not the only defect to moderate the degree of offence; but with intelligence there may be an absence of power to determine properly the true nature and character of the act, its effect upon the subject, and the true responsibility of the actor; a power necessary to control the impulses of the mind, and prevent the execution of the thought which possesses it. In other words, it is the absence of that self-determining power, which in a sane mind renders it conscious of the real nature of its own purposes, and capable of resisting wrong impulses. When this self-governing power is wanting, whether it is caused by insanity, gross intoxication, or other controlling influence, it cannot be said truthfully that the mind is fully conscious of its own purposes, and deliberates or premeditates in the sense of the act describing murder in the first degree: Jones v. Commonwealth, 75 Pa. 403.

The refusal of our offers, we submit, in the light of the high authority just cited, was a serious, fatal error in the court below; and even if they had been wanting to guide the learned judge, the offers should have been humanely allowed. To the requirements of the law as laid down in Jones v. The Commonwealth we were fully prepared to respond, and our embarrassment upon finding a legal and proper defence denied the defendant was equaled only by our surprise at the court's utter disregard of the high authority upon which we had so confidently relied, and to which we again call attention as showing clearly the error into which the court below was led. The witness to whom these offers were put had shown by his previous answer that he was fully competent to answer them. What would his answers have been? What would they have shown? Unquestionably, that the offence of the accused was not mur-

der in the first degree, and had he been allowed to testify, many others qualified to speak would have supported him. His answers would have shown those controlling influences in the mind of the accused to which we have referred, and might have gone further, proving not only that the offence was not murder in the first degree, but that the defendant was not responsible at all for what he did.

*Mr. Wm. D. Weaver, District Attorney,* and *Mr. E. K. Martin,* for the defendant in error:

This case as shown by the evidence of witnesses on behalf of the commonwealth and defendant, has none of the characteristics or attending circumstances surrounding the case of the Commonwealth v. Jones, upon which defendant wholly relies. In this case Jacobs was sober, and had been. In the case cited by defendant, the Supreme Court say Jones was in a continued state of excitement for ten successive days from the effects of laudanum and liquor. So we are forced to conclude, that in the one case there was a devilish malignity of disposition breaking out on a trifling provocation, while in the other there were enfeebled mental powers slowly dragging their victim into a state where he was incapable of either deliberation or premeditation. This court has drawn the lines of demarcation between these two conditions, in words so powerful and clear, that there can be no mistaking the distinction: Small v. Commonwealth, 91 Pa. 307.

OPINION, MR. CHIEF JUSTICE GORDON:

That the verdict in this case, under the instructions of the court, was right and warranted by the facts proved, no one pretends to deny. Neither is it contended that Jacobs, the defendant, was insane, in the legal acceptation of that word. That he was able to know and to distinguish between right and wrong is not gainsaid. That he had sufficient time for deliberation before he committed the fatal act, and that he acted, if not wholly without provocation, yet certainly without enough to excuse in the slightest degree so barbarous an act, the jury, on sufficient evidence have found. Being thus relieved of all doubt as to the sufficiency of the evidence and the justness of the verdict, all we have to do is to consider those technical

assignments of error which have been presented to us by the learned counsel for the plaintiff in error.   These specifications are three in number, as follows:

1. "The court erred in overruling the following question put to Dr. Joseph Furness: 'Were you able to judge in your intercourse with him what his temperament, disposition, and condition of his mind was?'"

2. "The court erred in overruling the following question put to the same witness: 'State what are the quality and characteristics of defendant's mind as to excitability?'"

3. "The court erred in overruling the following question put to the same witness: 'Please state whether or not in your judgment, there were such controlling influences in the mind of James H. Jacobs, the defendant, that it was not conscious of its purposes, and on account of those influences was incapable of deliberating or premeditating; and if so, what were those controlling influences?'"

The questions thus proposed were properly rejected, because had the required answers been received, the court could have done nothing else than instruct the jury to disregard them. They were intended, not to establish the fact that Jacobs, when he committed the homicide, was constrained by an insane impulse which for the time destroyed his free agency, but only to show that he was of an excitable temperament; that is, as we take it, that he was a man of quick temper, and when his anger was aroused his self-government was for the moment overcome, and he was at such times liable to commit acts which his cooler judgment would not approve.   But a rule which would allow the justification of crime on such pretext would utterly pervert and subvert the moral order of things. It may do well enough when applied to the brute world, where there neither is nor can be such a thing as moral obligation, and where individual impulses are regarded as mere instincts without mental control, but it will not do for the government of man to whom God has given a reasonable soul, by which if he will all his passions may be controlled.   And why should one man be excused for the results of passion and not another? The phlegmatic man may be moved to anger as well as the most nervous; the only difference is that it requires more to affect the one than the other; but when passion is once aroused in

either, it is the same unreasoning and unreasonable power. Why then should it not excuse crime in the one as well as in the other? If the murder of the latter may thus be reduced in degree, why not that of the former? Questions, such as these, at once show the utter inapplicability of the rule contended for, hence it must be rejected. The main object of the Penal Code is to compel men to restrain their evil passions and desires, hence the want of such restraint is rather an aggravation of than an excuse for crime.

But we need not dwell longer upon this subject, for the underlying principle of the above-recited assignments has been fully considered and disposed of by this court, in the case of Small v. Commonwealth, 91 Pa. 304, in which we held, that the evil dispositions of a defendant were not admissible in evidence for the purpose of excusing or mitigating his crime. We also refer to the forcible and pertinent remarks of Mr. Justice LOWRIE, on a similar proposition in the case of Keenan v. Commonwealth, 44 Pa. 55.

> The judgment of the Court of Oyer and Terminer is now affirmed, and it is ordered that the record be remitted to the said court for the purposes of execution.