## McHargue v. Commonwealth.

(Decided October 15, 1929.)

C. C. WILLIAMS, H. J. McCLURE and W. N. FLIPPIN for appellant.

J. S. SANDUSKY, G. M. BALLARD, B. J. BETHURUM and J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY— Reversing.

The appellant, Charles McHargue, his brother, James McHargue, and Dolphia Mullins, were neighbors and fellow employees at a limekiln at Pine Hill, in Rockcastle county. Charles McHargue has been convicted of the murder of Mullins and sentenced to life imprisonment. Several grounds for a reversal are submitted to the court, one of which is that the evidence against him, if taken as true, proved him guilty of manslaughter at the most, and not of murder, and, therefore, the verdict is not sustained by the evidence. This ground is well taken, and he is entitled to a reversal thereon.

The homicide occurred at the limekiln on a Sunday in November, 1928. Mullins and James McHargue had jointly cultivated 10 acres of corn, and it appeared there had been some misunderstanding between them with respect to gathering it. On this Sunday both Mullins and the appellant, Charles McHargue, were at work at the kiln. James McHargue testified that he had come over to a point near the kiln to assist in making a coffin for a child, and as he came by the place where Mullins was at work they again discussed the matter of gathering the corn. A fight between them ensued. The evidence is conflicting as to who precipitated the affray, which resulted in Mullins violently striking James McHargue in the head with a shovel rendering him unconscious. At the

time the appellant, Charles McHargue, was on a lower floor or platform and not in sight of the combatants. He was in the act of spreading out his dinner when some one above him at the place where the fight was going on screamed, "Doffey Mullins has knocked Jim McHargue's brains out." The appellant hearing that immediately rushed up the short flight of steps and there beheld his brother prostrate on the floor with blood gushing from his head; and, according to the state's evidence, the appellant declared that no one could treat his brother that way and fired his pistol at Mullins, who was in the act of turning away. According to the evidence in behalf of defendant, Mullins was standing over Jim McHargue with the uplifted shovel with which he had struck him, and attempted to strike the defendant also. There is no dispute that Mullins did turn and flee, and that appellant continued firing at him, one shot taking effect in the back. Mullins died a short while thereafter. The evidence is uncontradicted that appellant and deceased had been on the best of terms and there had been no trouble of any kind, between them. The defendant explained that he carried the pistol because he had considerable money on his person for payment to coal diggers employed by him in a small mine which he owned.

The court gave instructions on murder, voluntary manslaughter, self-defense, and a qualified instruction on the defense of his brother. He also gave the usual instructions on reasonable doubt and the meaning of terms used.

In considering the ground upon which the case is reversed, namely, that the verdict is flagrantly against the evidence, it is well to note the characteristic distinguishing willful murder and voluntary manslaughter, namely, the presence or absence of malice prepense or malice aforethought.

So long as all killing incidental to a felonious intent was punishable by death, there was no practical need for a classification or division of such homicides into degrees or different offenses. For generations juries refused to convict unless there was shown a specific intent and deliberate purpose to take life. So the need for a classification became more and more apparent. Through gradual processes and progressive considerations of mercy and humaneness, it was declared that death should only be inflicted as punishment for "homicides specifically and maliciously intended." Accordingly, it became

necessary to distinguish between this class of murder and murder in which there was no such premeditated intent. In the evolution of the law, the respective offenses became known as murder and manslaughter. Subsequently statutes—the earliest in Pennsylvania—divided murder into two classes: Murder in the first degree being a homicide with a specific, premeditated, and deliberate intent to take life; murder in the second degree when that intent was absent. Wharton's Criminal Law, secs. 501-503. But this state has never so classified homicide, the common-law distinction or classification of murder and manslaughter yet obtaining. Manslaughter has been divided into voluntary manslaughter, for which statutory penalties are prescribed, and involuntary manslaughter, which remains a common-law offense for which no punishment has been fixed by statute and which is, therefore, punishable only by fine and imprisonment in the county jail. Spriggs v. Commonwealth, 113 Ky. 724, 68 S. W. 1087, 24 Ky. Law Rep. 540.

An intentional, unnecessary, or perhaps a cruel killing is not always willful murder. It may be excusable if done in apparently necessary self-defense, or may be manslaughter when done without malice and in sudden affray or in sudden heat and passion. Farris v. Commonwealth, 14 Bush, 362.

As stated in 13 R. C. L., 789: ''The law recognizes no emotional state accompanying intentional homicide other than malice, the ingredient of murder, and passion, which accompanies the homicidal act in cases of voluntary manslaughter. Hence, if the element of provocation is lacking, the crime—the other elements common to both murder and manslaughter appearing in the case—must of necessity be murder.''

Premediated design or malice aforethought and heat and passion are contradictory states of mind and cannot exist at the same time with reference to the act of homicide. The existence of one element excludes the other. This is usually a question of fact for the jury to determine; but where there is no dispute as to the facts, or if only the evidence heard against the accused be considered, it becomes a matter of law for the court to adjudge.

To constitute murder there must have been a fixed design carrying with it deliberation and premeditation or predetermination (Buckhannon v. Commonwealth, 86 Ky. 110, 5 S. W. 358, 9 Ky. Law Rep. 411), and such pre-

determination must occupy the mind at the time of the killing. Frazier v. Commonwealth, 10 Ky. Ops. 136. These elements "consist in the exercise of the judgment in weighing and considering and forming and determining the intent or design to kill." Wharton's Criminal Law, sec. 419. The reader is referred to Turner v. Commonwealth, 167 Ky. 365, 180 S. W. 768, L. R. A. 1918A, 329, for a very interesting and exhaustive history and explanation of the phrase "malice aforethought," the opinion being prepared by Chief Justice Miller. This essential ingredient may be expressed or implied from the proven circumstances. It is a stereotyped expression in the form of instruction that the phrase "malice aforethought" means a predetermination to do the act of killing without legal excuse, and it is immaterial how suddenly or recently before the killing such determination was formed.

The definition and scope of manslaughter has been variously expressed. See Lucas v. Commonwealth (Ky.) 20 S. W. (2d) —, 231 Ky. 76. The editors of Ruling Case Law, in volume 13, at page 785, have compiled from leading cases and given us this statement: "If the act of killing, though intentional, be committed under the influence of passion or in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and reason to resume its habitual control, and is not the result of wickedness of heart or cruelty or recklessness of disposition, —then the law, out of indulgence to the frailty of human nature, or rather, in recognition of the laws upon which human nature is constituted, very properly regards the offense as of a less heinous character than murder, and gives it the designation of voluntary manslaughter. The absence of malice and the influence of sudden passion are the characteristics of this offense, as defined by the common law authorities and also by statutory enactment. The cases are generally harmonious that there must be sufficient cause of provocation and a state of rage or passion, without time to cool, placing the prisoner beyond the control of his reason, and suddenly impelling him to the deed. If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool and reason has resumed its sway, the killing will be murder. The distinction between murder and voluntary manslaughter is found in the dividing line between malicious action on

the one hand and action in the heat of passion on the other."

In our further assistance we may analyze the constituent elements of manslaughter. The phrase "sudden heat and passion," or as sometimes expressed, "sudden heat of passion," or "hot blood," is something less than impulse of the moment (which may arise from malice). Henson v. Commonwealth, 11 S. W. 471, 11 Ky. Law Rep. 314. The definition of passion given in Hocker v. Commonwealth, 111 S. W. 676, 33 Ky. Law Rep. 944 (as stated in Roberson, sec. 373) is: "Passion is that state of mind when it is powerfully acted upon and influenced by some external cause, and when used to describe an essential element of defense to manslaughter, it includes both anger and terror. And, while the word usually refers to a state of the mind brought about by anger, it properly speaking, expresses that condition of the mind when it has lost its self-control, and becomes the passive instrument of the actuating cause or feeling."

However, as declared in Howard v. Commonwealth, 224 Ky. 224, 5 S. W. (2d) 1056, 1057: "It is the duty of one whose will power is not impaired by disease to govern and control his passions."

The degree or exact meaning of this mental disturbance has been declared only in general terms; such that the passion of the slayer must have been to negative deliberation, that is, to deprive him of power to design to kill or to overcome and suspend the exercise of judgment and self-control, although not to the degree that volition should have been destroyed or reason dethroned, for that would be equivalent to utter insanity. "The principle involved in the question would seem to suggest as the true general rule that reason should, at the time of the act, be disturbed or obscured by passion to an extent which might render ordinary men of fair, average disposition liable to act rashly, or without due deliberation or reflection, and from passion rather than judgment." Robertson, sec. 373; 13 R. C. L. 789.

That degree of passion, though suddenly aroused, is often present in homicide cases, but that of itself does not mitigate the crime. All these elements must concur: (1) Suddenness; (2) heat of passion; and (3) adequate provocation. Heat and passion without such provocation, or provocation, however great, that fails to arouse spontaneously the other element, will not be sufficient to reduce the homicide to voluntary manslaughter. Cavan-

augh v. Commonwealth, 172 Ky. 799, 190 S. W. 123. The difficulty arises usually in determining the legal adequacy of that provocation. That is a question of law for the trial court to decide—usually appearing with the question of the propriety of an instruction on voluntary manslaughter. As the degree of passion engendered must be such as would cause the ordinary man of fair, average disposition to act rashly, so must the provocation be of a character that would have created that passion in a man of ordinary and average disposition. The law does not exact of us the cool, sedate, and deliberate mien of some men. Neither does it sanction or permit us to act as does the unusually excitable, impulsive, or rash man. We are all to be measured and judged by what the average, ordinary man does under similar circumstances. The provocation or moving cause for this state of mind we are considering must be of such a nature as to justify the accused, as measured by this rule, and while impelled by such passion, to act without deliberation and while incapable of cool reflection and deaf to the voice of reason. Wharton's Criminal Law, sec. 425. This principle finds expression in the approved form of instruction as given in Hobson on Instructions, sec. 542, as "provocation *ordinarily* calculated to excite passion beyond control," or as that given in section 746 as *"reasonably* calculated to excite the passion of the defendant beyond the power of his control," which phrase is used in Miller v. Commonwealth, 163 Ky. 246, 173 S. W. 761, 763, and many other cases in stating in a general way what is deemed adequate provocation. Just what that degree of provocation is cannot be exactly declared because of the myriad circumstances of the cases.

Bishop, in his work on Criminal Law, sec. 701, says: "Not attempting an impossible exactness, we may deem it in a general way to be that the law accepts human nature as God has made it, or as it manifests itself in the ordinary man, and every sort of conduct in others which commonly does in fact so excite the passions of the mass of men as practically to enthrall their reason, the law holds to be adequate cause."

We must, therefore, look to the cases in which this principle has been applied and be guided by them in determining the sufficiency of the provocation in the case before the court.

In the annotations to Commonwealth v. Paese, 17 L. R. A. (N. S.) 795, it is stated: "The authorities seem agreed that the killing or assaulting of a relative will

amount to a sufficient provocation to reduce the killing of the wrong-doer to manslaughter, provided no previous wrongful intent on his part is shown.''

Several cases are there referred to applicable to this case. In Collins v. United States, 150 U. S. 62, 14 S. Ct. 9, 37 L. Ed. 998, where defendant's brother had been assaulted by deceased and defendant secured a pistol and shot the offender, an instruction was held correct to the effect that, if the defendant in a moment of passion, aroused by the wrongful treatment of his brother, and without any previous preparation did the shooting, the offense would be manslaughter and not murder. In State v. Horn, 116 N. C. 1037, 21 S. E. 694, it was held that defendant, seeing deceased shoot down his brother, or seeing the brother and the deceased a few moments after deceased had shot him, amounted to sufficient provocation to reduce the killing to manslaughter.

In the case of Guffee v. State, 8 Tex. App. 187, where the accused had killed the assailant of his brother, it was held that, if in one's presence his brother be killed and he slay the assailant, it may constitute adequate cause for mitigating murder to manslaughter, provided the brothers were not jointly engaged in an unlawful act; or, if without malice and in ignorance of any unlawful design of his brother against the deceased, the accused fired upon him when the latter shot or was in the act of shooting his brother, the offense was not of a higher grade than manslaughter, notwithstanding his brother may have brought on the conflict with malicious intent.

See, also, State v. Grugin, 147 Mo. 39, 47 S. W. 1058, 42 L. R. A. 774, 71 Am. St. Rep. 553, for a discussion as to the adequacy of provocation making homicide manslaughter instead of murder, and the annotations to Johnson v. State, 5 L. R. A. (N. S.) 809, for further treatment of the subject of heat of passion which will mitigate or reduce the degree of homicide.

In Campbell v. Commonwealth, 88 Ky. 402, 11 S. W. 290, 292, 10 Ky. Law Rep. 975, 21 Am. St. Rep. 348, a father being informed of the brutal and cruel abuse of his daughter by her husband, seized a pistol and went three squares distant to his daughter's home and there found her and her children in the street in the nighttime, driven from their home, and after some words had passed between him and his son-in-law he killed the latter. It was held that he had provocation to do the act sufficient in law to reduce the crime to manslaughter. As stated

by Judge Pryor for the court in that opinion: "In this case there was no blow or trespass to the person, but, from the testimony on the part of the state, the killing by the father was under the influence of sudden heat and passion, in the effort made in good faith to protect his daughter against the assaults of her husband. It is not necessary that a blow should be given or a trespass committed on the person of the accused in a case like this to reduce the crime from murder to manslaughter. The true test is 'Whether the law deems the provocation calculated to excite the passions beyond control;' if so, it reduces the offense from murder to manslaughter. 2 Bish. Crim. Law, 711. It is difficult to establish any rule defining the crime of 'manslaughter' that will apply to every state of case, and hence the necessity of placing before the jury in such a case as we have here the right of the father to protect his child; for if a stranger had appeared upon the street, and taken the life of the deceased, not in self-defense, the crime could not be reduced to manslaughter, upon the idea that he was provoked to take the life of the deceased, because of the story of the wrongs perpetrated on the injured woman; nor could the father, unless impelled by passion created at the instant of time, have the offense reduced to manslaughter; but the law in its wisdom, looking to the frailty of human nature, and the passions common to all men, where there is a sufficient provocation, will punish for the lesser offense; but, as said by Christiancy, J., in the case of Maher v. People, 10 Mich. 212, 81 Am. Dec. 785, 'provocations will be given without reference to any previous model, and the passions they excite will not consult the precedents.' "

In Roberson's Criminal Law, sec. 382, several other domestic and foreign cases are cited in which variant facts were deemed provocation sufficient to mitigate the crime of murder into manslaughter, and others insufficient for that purpose.

With the distinction between murder and manslaughter in mind, we approach a consideration of the facts as they appeared to the appellant, and look to his situation at the time.

While spreading out his lunch with his mind centered thereon, he suddenly hears the excited exclamation just above him that his brother, with whom he had been intimately and closely associated, had had his brains beaten out. The average man, we think, would have immediately

rushed to the point. In a moment the defendant saw the unconscious form of his brother prostrate on the ground with blood gushing from his head, and his assailant in the act of turning to flee (according to the commonwealth's evidence), or standing there over his brother with the instrument with which he had struck the blow ready to strike again (according to the defendant's evidence). The average man, we think, would have lost his self-restraint and would have acted as did the defendant. It may be said parenthetically that the carrying of this deadly weapon by the appellant is a matter of condemnation, and no excuse or condonation is intended for this violation of the law. But for it this unfortunate tragedy would never have occurred. We mean simply to say that, had the average man had it available under the circumstances, it would be but natural and inherent in him to use it at the moment. Nature planted in us a dominant fraternal love, and when this virtue is so deeply touched and aroused, not to recognize that inherent attribute would violate the principles of eternal justice. This sentiment is eloquently stated in Guffee v. State, supra, thus: "Down deep in the human heart there is an abiding love for our kith and kin, which intensifies as we approach a common parentage. A brother's virtues are magnified and his faults overlooked, and upon summons we fly to his relief without pausing to contemplate the consequences to ourselves, or taking much time to consider whether, in the particular instance, he is in the right or the wrong. It suffices usually for us to know that he is in danger and needs our assistance, and we blindly follow that impulse born in us, and which impels us to rush to the rescue and save him from harm, and leaves us to contemplate our actions after the danger has passed and reason has resumed its sway. This infirmity (or virtue) in human nature cannot be ignored in the practical administration of justice."

As stated, the defendant and deceased were friends. There was no proof of any preconceived purpose on the part of the defendant to take the life of Mullins, nor facts from which malice aforethought might be reasonably inferred. When suddenly apprised of the condition of his brother, he yielded to an impulse derived from nature and common to humanity, which is recognized as a legal provocation. Where there is no evidence of premeditation or other proof of malice, proof of reasonable and adequate provocation will negative malice and

reduce the offense to voluntary manslaughter. Helm v. Commonwealth, 156 Ky. 751, 162 S. W. 94; Miller v. Commonwealth, 163 Ky. 246, 173 S. W. 761. The court is, therefore, of the opinion that the verdict finding the defendant guilty of murder is palpably against the evidence and requires a reversal of the judgment and the granting of a new trial.

Criticism is made of the lower court's ruling upon the admission and rejection of evidence. There were some errors admitted in rejecting testimony offered in behalf of the defendant, but it appears that similar evidence was admitted during the progress of the trial, so his rights were not prejudiced.

It is also urged upon us that error was committed in qualifying the instruction with respect to the right of the defendant to defend his brother; this qualification being to the effect that, if James McHargue brought on the difficulty between Mullins and himself and when he had no reasonable grounds to believe it necessary to protect himself from Mullins, and thereby brought on such danger to himself, the jury could not acquit the defendant upon the grounds of the defense of his brother. As stated, the evidence as to the encounter between James McHargue and deceased was conflicting, and, while this defendant had no knowledge of what had transpired, his right to defend his brother was no greater than the brother's right to defend himself. He stood in the place of his brother. McIntosh v. Commonwealth, 96 S. W. 917, 29 Ky. Law Rep. 1100; Stanley v. Commonwealth, 86 Ky. 440, 6 S. W. 155, 9 Ky. Law Rep. 655, 9 Am. St. Rep. 305; Crockett v. Commonwealth, 100 Ky. 382, 38 S. W. 674, 18 Ky. Law Rep. 835; Roberson's Criminal Law, 343.

Extracts from the argument made by counsel assisting in the prosecution are in the record, and it is vigorously insisted that this alone constitutes sufficient error for a reversal. Counsel did go out of the record and stated to the jury what appears to have been his personal knowledge as to the high character and reputation for peace and quiet of the deceased. This was improper. It is likely not to occur on another trial.

The judgment is reversed for the reason indicated.