## Little v. Commonwealth.

(Decided Nov. 15, 1932.)

A. B. BYRD and ERVINE TURNER for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER
—Reversing.

The appellant, John C. Little, has been convicted of the murder of Charley Hollon and sentenced to life imprisonment. The men were neighbors and friends for fifteen years. Except for an apparent immaterial unpleasantness several months before Hollon was killed, which had been adjusted afterward, there had been no difficulty between them.

About 4 o'clock on the afternoon of October 28, 1931, Little and a young man named Everett Hollon, who worked for him, were returning home on their mules from work. As they were passing Charley Hollon's home, they stopped to talk with him. The evidence of the widow and another is that Little asked Hollon to go "to the barn for secret." It was on Little's way home, about a hundred yards away. According to Little and Everett Hollon, Charley Hollon invited Little to ride around to the barn, saying he wanted to talk about getting him to help work on a barn or some other building. Mrs. Hollon testified that Little was carrying some bulky thing under his coat and creates the impression, at least, that it was a half-gallon jar of whisky. This was denied. When the deceased and the defendant went into the barn or crib, according to the latter, Hollon uncovered a ten-gallon keg of moonshine from under some soy beans, drew off some of the liquor into a quart jar he had brought from the house, and they took a drink. He went out and invited Everett Hollon to come in and partake, which he did. After a bit Hollon, with some viciousness and profanity, accused Everett of owing him a dollar which he wouldn't pay. He admitted the debt but declared he couldn't pay. Appellant then paid the deceased for Everett, since he was working for him, and that seems to have settled the matter.

Mrs. Hollon and a boy working for her husband, Bodell Gilbert, went to the barn and milked and fed the cows. She heard the men there laughing and talking. She returned to the house and got supper and called her husband several times but he did not come. She ate and then went down back of the barn "near about dusky dark" and asked her husband to feed the mules, which he refused to do. Mrs. Hollon testified that she stayed around the crib or barn listening to the men for

about an hour without her presence being known. She heard no quarrel or trouble between any of them. She heard Little send Everett Hollon to the store to get him some tobacco. While he was gone, her husband and Little talked about the work on the barn and Hollon invited Little to eat supper with him, but he declined because, as he stated, he was drunk and didn't want to disturb his wife and children. Everett returned in about half an hour, which was after dark, and according to her statement was between 7:30 and 8 o'clock. The men seem then to have gone to the corncrib. When Everett came the defendant asked if his wife had found him out and Everett said she had and had quarreled a little. The witness continued: "John (the appellant) asked him if he got the tobacco and he says 'yes, I have got a special for you, Charley.'" Then the shooting began, and there was just a continuous roar until it was all over. Nothing else was said by any of the men before the shooting began except as related. At another place in the widow's testimony she said that Everett, addressing her husband, said: "G—— d—— you, I have got the cartridges for you Tide." Although saying that the shooting was done by both Little and Everett, she testified that she did not see all of the shooting, "but when I came up I stepped a step or two and John Little had hold of Charley Hollon with the pistol in one hand and Charley Hollon sinking down, pitched right out face foremost in the barn lot." There was an obstruction to her view, but she saw Everett "reach something to him." Later she said that she did not see him do that, but did see Little "reach out." The shooting started just as quick as Everett got there and while the men were standing in the crib door. Then she testified she didn't see her husband when the first shot was fired. Further: "Just as the shooting stopped I got there; John was holding Charley with one hand and a pistol in the other; this boy had a pistol in his hand running outside." Everett fled with the pistol in his hand. Her husband was not armed, his pistol then being in the house. The defendant and Everett were drunk. Her husband was shot ten times.

A daughter of the deceased testified to having gone up to the crib and talked to her mother just before the shooting began. She was on one side and her mother on the other side of the crib. She saw Everett Hollon coming down the road, but on her direct examination did not undertake to tell what occurred, except to say

that immediately after the shooting Everett Hollon went through the yard with the pistol and she saw John Little in the crib putting one in his pocket. He then had her father by the shoulder as he was sinking down. On cross-examination the young lady volunteered the statement that upon his arrival Everett Hollon drew a pistol on her father and said to him, "Yes, G—— d—— you, I got some special .38's for you," and then fired.

The defendant and Everett Hollon deny emphatically that during the afternoon Everett was sent or went to the store for any tobacco or that he left the place. Everett admits that after the shooting he went there and got some tobacco and had it charged to Little, by whom he was employed and who permitted him to do that, and also that he borrowed a pistol and some cartridges from Terry, the merchant. As to the immediate events which they say occurred about 6:30 o'clock, we quote the appellant's testimony:

"Q. 96. Well, what occurred, go ahead and tell what occurred? A. She hollered for Charley to come on to supper and Charley never answered; she hollered again and says 'Are you asleep?' Charley says 'No, by God I am not asleep.' Charley says 'It wouldn't take me a minute to go over there and kill that whore, she has caused me every enemy I ever had in my life.' Charley looked up at the Hollon boy standing in the yard and says 'Your brother and Walter Caudill has tried to destroy my family' and says 'There is nothing in these God damn Hollon's, are they John.' I says 'I don't know, they have always been nice to me.' He says 'There is Chester, God damn horse rogue, been in the penitentiary for stealing horses.' The boy says 'Charley, you need not jump on me for what somebody else has done.' Charley says 'By God you are one of the crowd, I will shoot you right now.' Charley raised and throwed his hand in his pocket and took some kind of pistol, I can't state what kind it was, and when he done that Hollon begin shooting."

Everett Hollon had two pistols and shot them both at the same time. He had theretofore practiced that art. It is not claimed that the deceased fired his pistol. Everett picked up the deceased's pistol from the ground and went away with it. His wife then came quickly.

Everett Hollon relates what occurred just about the same way as Little. Both men deny that appellant had a pistol or fired a shot or did anything at all. Each of them had taken one drink and the deceased had had several. Everett Hollon says that he regularly carried one pistol and that the other one was returned by his brother to him that day as he was passing his brother's home. The reason for borrowing the other pistol from Terry was in order to get the cartridges, as he didn't know who might follow him. He did not tell Terry about the killing. The next day he surrendered to the officers.

According to the widow, right after the killing the appellant helped her pull the body of her husband into the door out of the mud. He said, "It wouldn't surprise me a damn bit if there wouldn't be five or six men killed." Then she and her children went to the house; he followed and demanded that she get him a pistol to protect himself with. She obtained and gave a pistol to him, and then he staggered around for an hour or more talking rough to her, and cursing and threatening to kill her little boy. She begged him all during this time to go and tell what had happened. Finally he left and some neighbors came, followed by Little. A daughter testified that after the killing Little put a pistol in his pocket and got her father's pistol at the house and threatened her with it. A neighbor woman quickly on the scene corroborates the widow in other particulars.

According to the appellant, Mrs. Hollon and her daughter came from the house to the crib with a lamp after the shooting and asked if her husband was killed. Together they tried to pull the body up into the crib. He suggested he would leave, and she insisted he must stay with them. When he said he had nothing to protect himself with, she handed him a pistol and begged him to stay and not "let them come in here and kill the rest of us." She said she had sent some of the children for help, but no one having come, she asked him to get on his mule and see if he could get somebody. He started down the creek and met several men and came back with them and they carried the body into the house. He stayed a few minutes longer, and some one advised him to leave because somebody might think he had something to do with the killing and might kill him. He denied mistreating or threatening the widow and

family. Mrs. Hollon admitted having told a neighbor and one of the men who carried the body to the house that she thought if Charley had a friend in the world it was John Little. Others testified that the widow said that Everett Hollon had killed her husband and she didn't think the appellant had anything to do with it. These statements are practically admitted, although Mrs. Hollon claims she made them because of her fear that Little would kill her and her children. At the time there were a number of men and friends gathered around her. There is evidence that she said she went to the barn after hearing the shooting and that she made no claims that night to having been an eye-witness. She also told the neighbors in substance that she had given her pistol to Little to get him to stay with her.

Everett Hollon testified that when he surrendered to the deputy sheriff he gave him the deceased's pistol which he had picked up from the ground as he was leaving. Little gave the one he got from the widow to her a few days later. The pistol Everett got from the merchant was returned within three hours after he had taken the cartridges out. None of this disarmament is contradicted.

The actions of the appellant after the killing do not seem to us to be inconsistent with his innocence.

Is the verdict of the jury flagrantly against the evidence, as the appellant contends? While it is fundamental that the jury are the judges of the credibility of witnesses, and the weight to be given the evidence, yet this court, in the interest of justice, is empowered to set aside a verdict if it be palpably or shockingly against the evidence and appears to have been influenced by passion and prejudice. Anderson v. Commonwealth, 196 Ky. 30, 244 S. W. 315; Brown v. Commonwealth, 226 Ky. 255, 10 S. W. (2d) 820. In determining that we also must weigh the evidence. There are then brought to bear the factors of its reasonableness and consistency as measured by the entire testimony, the admitted circumstances and conditions, and the physical facts, and an appreciation of human nature. We have not undertaken to disclose in this opinion all of these elements as they are made to appear in the record. It would seem sufficient to say that the evidence of the commonwealth's witnesses in its material aspects doesn't ring as true as a flawless

bell. Even so, the evidence of the widow as to the immediate event is not inconsistent with the claim of the defendant and Everett Hollon that the latter alone did the shooting. She only said that Little reached out to Everett for something. It may have been the tobacco which she says he had sent for. It is not likely that Little would have caught and aided the falling body if he had shot him. In the excitement of the moment she may have been mistaken as to whether the pistol was in her husband's hand or the appellant's. A pertinent inquiry is: Why should the appellant have secured the widow's pistol for his protection if he already had one as she claimed? Taking the evidence as a whole, there is nothing in it, reasonably and rationally regarded, that can be deemed sufficiently convincing of appellant's guilt to justify sustaining the verdict. See Combs v. Commonwealth, 201 Ky. 199, 256 S. W. 4; Mullins v. Commonwealth, 230 Ky. 624, 20 S. W. (2d) 442; Howard v. Commonwealth, 243 Ky. 450, 48 S. W. (2d) 1080. We are led to the conclusion that the judgment should be reversed because it is flagrantly against the evidence.

An opinion as to other points raised is reserved.

Judgment reversed.