## Young v. Commonwealth.

(Decided June 11, 1935.)

FRANK YOUNG for appellant.

BAILEY P. WOOTTON, Attorney General, and DAVID C. WALLS, Assistant Attorney General, for the commonwealth.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Reversing.

Under an indictment charging him with the murder

of Cecil Keyes, Frank Young has been found guilty, his punishment fixed at life imprisonment and he is appealing.

One of the grounds urged for reversal is that the court erred in not granting a new trial on the ground of newly discovered evidence. In support of this ground, the alleged newly discovered evidence is set forth in an affidavit of John Lantrip, the newly discovered witness referred to in the motion and grounds for new trial, but we find in the record no affidavit of appellant showing that he could not, by the exercise of reasonable diligence, have known of the existence of the newly discovered evidence until after the trial was completed. In such circumstances the court did not err in overruling the motion for new trial on this ground. Oakley v. Commonwealth, 158 Ky. 474, 165 S. W. 691; Pierce v. Commonwealth, 214 Ky. 454, 283 S. W. 418.

It is further urged by appellant that the court erred in the admission of incompetent evidence concerning his acts and conduct in the afternoon before the homicide and in no way connected therewith, but this is not included in the grounds for new trial, and a careful examination of the transcript of the evidence reveals no objections or exceptions to the evidence called in question or to improper questions propounded to witnesses by the commonwealth's attorney. Some of the questions propounded to appellant on cross-examination concerning matters that occurred in the afternoon and having no connection with the homicide were improper and of a prejudicial character, and some of his evidence concerning matters about which he was asked was incompetent, but, in the state of the record as above indicated, this court, under well-established rules, cannot consider these matters on appeal.

Finally, it is argued in substance that the verdict is flagrantly against the weight of the evidence. The homicide occurred about 10 p. m. at a dance given at the home of Mrs. Effie Latham in Mannington. The entertainment started with a square dance in which Cecil Keyes with a male companion as a partner participated, but thereafter, according to the evidence of witnesses for both the commonwealth and appellant, he was unable to secure a partner; appellant and his witnesses testifying that it was because Keyes was intoxicated. The great weight of the evidence shows that

appellant became incensed at the refusal of the women to dance with him and was somewhat threatening and boisterous, saying in effect that, if he could not dance, there would be no dance; that he left, taking with him his half-brother, Francis Vandiver, who, with his violin, was leader of the music. Witnesses for appellant testified that he made Vandiver leave with him, while Vandiver's evidence indicates that he left of his own accord; that he told Mrs. Latham when she asked him to play, that he had some sick children and could not be away from home very late. After Keyes, Vandiver, and some others left, the dance continued for a short time by radio music until the lights went out. Upon investigation, it was found that the electric wires leading across the creek to Mrs. Latham's home had been cut. Appellant testified that, when the lights went out, he was on the back porch; that he went out to examine the wires and found them cut; that he saw Keyes and two others going from the place where the wires had been cut, and so informed Mrs. Latham, who thereupon went to the home of Keyes, as stated by herself and other witnesses, to get him to come and connect the wires. When she accused him of cutting the wires, he denied it, and they had some controversy about the matter, but finally Keyes and his wife accompanied Mrs. Latham back to her home. When they arrived there, appellant had climbed a pole and was attempting to connect the wires and Keyes held a flashlight so he could see how to do the work.

Mrs. Keyes stated that, after the wires were connected and the lights came on, Mrs. Latham told deceased that Willie Holmes said that he (deceased) had cut the wires. That deceased asked Holmes if he had made the statement, and, when the latter responded that he had, deceased kicked him in the face. That Mrs. Latham then went up to deceased and said, "You kicked the wrong man—Frank Young is the man who said he saw you cut the wires." That he then walked up to appellant and said, "Frank Young did you say I cut the light wires?" Appellant at first said nothing, but finally replied that he did and came out with his pistol, grabbed deceased's right arm with his left hand and commenced shooting. That at the time appellant's wife had hold of deceased. That appellant fired four shots before deceased fell, and after he fell shot him again

in the back of the neck. She testified that during the affray deceased had no pistol in his hand, but stated that he was carrying a pistol in a "scabbard," and, after he had fallen, the pistol was lying on the ground a few inches from his left hand. Some one present picked the pistol up and gave it to a relative of deceased, who took it to her home, and one of the officers who went to the scene took charge of it. It was an automatic, and the officer testified that the magazine would hold 11 cartridges; that it was cocked with the safety off and with 10 cartridges in the magazine and an empty shell in the barrel. The officer also testified that, when an automatic is fired, the empty shell is thrown out unless it hangs, and that the empty shell might be put in the barrel for safety. He testified that the pistol had no odor to indicate that it had been recently fired.

Charlotte Dill, a girl about 14 years of age, testified that just a week previous to the homicide she and her father went with deceased in his automobile to Crofton; that deceased was sitting in his car in front of a store and appellant, who was talking to her near the store, stated that, if she would get out of the way, he would kill Keyes, and her father testified that he heard this statement made. Appellant denied that he made such a statement. No other witnesses for the commonwealth profess to have witnessed the shooting or attempt to detail the facts concerning it. Appellant, after detailing the boisterous conduct of deceased at the time and the facts as above recited concerning the cutting and repairing of the wires, testified that deceased shined the light on him when he was fixing the wires and then went over to the boardwalk, where he was cursing, and said, "I cut the wires, if any son of a bitch here wants to take it up." He stated that he did not see the altercation between deceased and Willie Holmes, but saw the place on the side of the latter's face when he came to him and asked him for his pistol. That he refused to let him have the pistol and walked up to the back fender of Arch Carrol's car. That deceased was cursing and Hanson Long said, "If you will stop this and behave yourself, I will buy you a pint—there is no sense of you doing this way." Hanson sent for the liquor and gave it to deceased, who passed it around and took a drink himself and then walked off, and he thought he had quieted down, but deceased approached

him and said, "God damn you Frank Young, did you say I cut those wires." He replied in the negative, and told him to forget about it, when the latter again applied a vile epithet to him and said, "You have started something you can't stop." That his wife and Mrs. Keyes tried to restrain deceased, and he stepped around behind the car, and deceased, who had freed himself from the women, came around the car and hit him in the face with the pistol, and the pistol fired. That he grabbed at it and drew his own pistol and started shooting. That he fired the last shot as deceased was falling, but, when he saw he was going over, he fired no more. Other witnesses present testified that they saw where appellant had been struck in the face. W. O. Sayer, who held the examining trial, testified that, when appellant appeared before him on the morning following the homicide, there was a bruise on his forehead and powder burns and what appeared to be six or eight grains of powder in his forehead. The coroner and undertaker testified concerning the wounds on the body of deceased. The former stated that one shot entered the front of the neck and came out the back or at the side, but he noticed no indication that a shot had entered the back of the neck. The latter testified that he examined the body and found that a shot had entered the back of the neck, but he, like other witnesses in describing the range of the bullets, would say "It went this way," evidently indicating the range to jury, but the transcript does not reveal the range indicated by the witnesses.

The evidence for both the commonwealth and appellant conclusively shows that, when deceased returned to Mrs. Latham's place, he was in a very belligerent mood, and the weight of the evidence indicates that he was in such a mood even before he left the dance. The evidence for the commonwealth shows that, after deceased had assaulted Willie Holmes because of the statement made concerning the cutting of the wires, he then turned upon appellant, and there is little, if any escape from the conclusion that he did strike the latter with his pistol. Except for the alleged threats which were made by appellant a week prior to the homicide and to which in all the circumstances no great importance may be attached, there is no showing of previous difficulty or ill feeling between appellant and deceased. Unques-

tionably the evidence strongly conduces to establish killing in sudden affray or in sudden heat and passion, and conviction of voluntary manslaughter might properly have been sustained. From a comprehensive view of all the evidence, and considering that for the commonwealth in relation to the record as a whole, it will be seen that there is slight evidence, indeed, to indicate a preconceived design upon the part of appellant to take the life of deceased or facts to establish or from which malice aforethought might reasonably be inferred.

When the evidence is so considered and analyzed, it will be seen that there is little material conflict between the evidence of Mrs. Keyes, the principal witness for the commonwealth, and that of appellant, excepting the evidence of the former that the latter fired one shot into the back of deceased's neck after he had fallen to the ground. She stated that deceased had no pistol in his hand, but her evidence, as well as that of others, as to the physical facts immediately after the shooting establishes with a reasonable certainty the truth of the statements of witnesses that he did have the pistol in his hand. She stated that appellant caught deceased's right hand or arm with his left, and appellant says that he caught at the pistol when deceased brought it down.

Evidence that would uphold a verdict for manslaughter may be palpably against the verdict finding accused guilty of murder. McHargue v. Commonwealth, 231 Ky. 82, 21 S. W. (2d) 115. Notwithstanding a verdict for a lesser degree of the crime charged in the indictment might have been upheld under the evidence, it is our conclusion that the verdict returned is palpably against the weight of the evidence.

Wherefore the judgment is reversed.