## Steele v. Commonwealth.

(Decided March 27, 1936.)

W. A. DAUGHERTY for appellant.

B. M. VINCENT, Attorney General, and GUY H. HERDMAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

The appellant, Josephine Steele, was indicted at the June special term, 1935, of the Pike circuit court, charging her with the willful murder of her ex-husband, John D. Steele.

Upon trial, she was convicted of manslaughter and sentenced to two years' confinement in the penitentiary.

She appeals, relying upon the following grounds for a reversal of the judgment: (1) The refusal of the court, at the conclusion of all the evidence, to sustain her motion to peremptorily instruct the jury to find her not guilty; and (2) that the verdict was the result of passion and prejudice, and flagrantly against the evidence.

No complaint is made as to any ruling of the court upon the evidence, nor is there any criticism of its instructions given, nor is it asserted that its rulings throughout the trial were biased or in any respect manifested a lack of proper consideration of appellant's rights.

As both of the assignments of error alike relate to the evidence, the one involving the question of the weight and sufficiency of the evidence to warrant submission of the case to the jury and the other its sufficiency to support the verdict found thereon, we will consider and dispose of these grounds together, and for which only a brief statement of the material facts in evidence need be given.

Such facts, as disclosed by the evidence, are that the deceased and appellant were married some 17 years ago, when appellant was 17 years of age, and her husband, the deceased, 37; that five children have been born to them, three of whom are now living; and that appellant and the deceased have, since their marriage, lived at Boldman, Pike county, Ky., where they had acquired a store and residence property, in which they lived and operated a hotel, also a restaurant and whisky business, the deceased being also employed as night foreman at the mines of the Pike-Floyd County Coal Company.

It further appears that during the last three or four years of their marriage, the deceased became strongly addicted to drink, frequently indulging in "bad spells" or sprees, at which times he was given to being "jealous hearted" and very abusive and brutal to his wife. From such time, it appears that these sprees became of increasing frequency, until, as stated by appellant, the last year or so of her life with the deceased became a very hell, due to his almost constant brutal and inhuman treatment of her while drinking,

and his "sprees" became a matter of almost daily occurrence; and that, from such cause, her situation as his wife became so unbearable that in March, 1935, she sued for and was granted a divorce, when she testifies it was agreed between them that he would leave her and his family and live elsewhere, while she would remain in the home with their three children and take care of them. However, this agreement, it is claimed, was soon broken by the deceased, who, after leaving, returned in a few days and again took up separate living quarters in the hotel, where he proceeded to again, almost daily, abuse and harass the appellant by renewing his fiendish and brutal assaults upon her, whipping and beating her and subjecting her to almost every form of indignity and inhuman treatment, eventually culminating in his being shot and killed by appellant on the evening of June 16, 1935.

Appellant having been indicted and charged with murder for her admitted killing of her ex-husband, upon her trial therefor the commonwealth's evidence went no further than to show the admitted fact of appellant's having shot and killed the deceased while he was in the upstairs hallway near her room at her home, as testified to by the several parties who, hearing the shot fired that killed Steele, had rushed to the scene, and found him lying in a dying condition at the head of the stairs, near the doorway, where, it is testified by some of them, they saw appellant standing with a pistol in her apron pocket.

Further, the commonwealth introduced evidence to the effect that appellant had upon several occasions been heard to make statements, in the nature of threats, against the deceased, which manifested a hostile and malicious feeling toward him, showing motive for shooting him. Of such nature was the evidence of one such witness who testified that he was present in the resturant when some one sought to buy some whisky of deceased on credit and the deceased proceeded to sell it, when appellant, objecting to it, had remarked, "Some of these days I will kill that s. o. b. and put a stop to that." Also, it was testified by another, an automobile salesman, that when he was trying to sell appellant a car, which deceased would not agree to her buying, she had said "she would have to wait until she got rid of him before she could get the car." Also, another witness, Earl Tackett, stated that appellant had said

to him, when suing for her divorce, that "if she didn't get a divorce and leave there, she was going to kill him or he would kill her." And yet another witness, a Mrs. Marrs, stated that she had called upon the appellant in May, about a month before the killing, and had tried to sell her some pies, asking her if she would buy one to give to her "old man," to which appellant had replied that "she had rather give him strychnine."

Beyond this evidence, purporting to show appellant's state of mind and feeling towards the deceased shortly before she shot and killed him, the commonwealth did not introduce any evidence to contradict the testimony of appellant and her witnesses, detailing the deceased's long course of brutal mistreatment of appellant nor tending to contradict or avoid her defense to the murder charge that when she shot appellant he was beating with a wrecking bar on the door of her room and declaring that he was coming in and kill her, when she fired through the door to save her life.

The commonwealth did introduce some evidence to the effect that the door showed no such marks or scars upon it, such as it was contended it must as a physical necessity have shown had deceased attempted to break through same by felling it with a wrecking bar, as testified to by appellant.

On the other hand, the testimony of appellant, which is in the main substantially corroborated by the testimony of her two children, the 15 year old daughter and the 9 year old son, and another witness, is to the effect that the deceased's worst treatment of her occurred when he was under the influence of liquor, when the accused states, at times "he decided he would kill me in different ways, he would want to choke me to death and if that didn't do, he would want to black my eyes or break my arms"; that about a year ago he "began keeping a pistol about" and when that was hidden from him, on two different occasions he had borrowed a gun to kill her with; that he would tell her, when leaving home, that he was going to get a gun and come back and kill her; that about two weeks before the killing, he had come upstairs and told her he was going to give her a bad beating, that he had a gun swinging down by his pants pocket; that, when he grabbed her, she had grabbed the gun and thrown it over the bannisters; that when he was drinking and would beat her if she had on a decent dress, he would

cut it to strings; that about six weeks before he was killed, on one Saturday afternoon, he had come into the restaurant where appellant was working and decided he would close up, to which she had replied "All right," and had gone into the dining room, when he followed and hit her over the head with a flash light, bringing the blood, and then tore off her clothes, leaving her slumped on the floor. Also, it is testified by the appellant and another of her witnesses, that upon another occasion, a short while before the deceased was killed, witness was at their place of business, with his brother and two others, when deceased "tore her clothes off, tore every bit of clothes off down to about there in front, and after he tore her clothes off, he got her by the leg and drug her by one leg to get her in," thereby exposing her person.

Appellant's account of this happening is that deceased assaulted her out on the highway in front of the house, when he tried to break her neck and arm, and knocked her to the ground, when he tore the clothes off of her out on the street, as she plead with him to leave her alone, after which, thinking he had "knocked her out," he dragged her into the house by one foot in the presence of nearby onlookers.

Such appears to have been the condition of living to which appellant was repeatedly subjected by her ex-husband, whose brutality finally culminated in his fatal shooting and death, on the evening of June 16.

Appellant's evidence as to the causal facts and circumstances leading up to this is that on the Saturday night before the killing, the deceased was drunk; that after leaving the house and going away he came back again late in the night, to her room, when she was awakened to find him standing beside her bed with a Barlow knife in his hand, and said he had decided that she had lived long enough; that she had talked him out of killing her, when he had reached over to the wall where hung her clothes and stripped them with his knife; that the deceased then got in his car and went away, after which she did not see him again until between 2 and 3 o'clock that Sunday afternoon, when she and her little 9 year old boy were sitting in the living room and saw him coming up the road in his car, which he ran into the house porch, knocking down one of its posts; that seeing he was drunk, she and the little boy went upstairs and locked themselves in her

daughter's room; that appellant, first stopping at the restaurant and breaking up a lot of bottles, then came upstairs to her door and called to her to "let him in," and, upon her refusing to do so, he then went downstairs, cursing and threatening her as he went, to get a "wrecking bar," when he came back to her door and "told me he was coming in and get me, I asked him not to, I even begged him not to," to which he answered that "he meant to kill me and I might as well unlock the door and come out to save him from tearing it down, but I didn't unlock it and he struck the door at the top of the door facing with the wrecking bar and when he did that I shot down there in about six inches of the bottom of the door," and when he struck the door again she shot through the top of the door, when he went away, only to later return about 7 o'clock that evening, to the room, where she had remained and was, with her little son, again locked in.

Appellant's testimony as to what occurred upon this return and assault by deceased upon her room is as follows:

"He came back up the stairs and called to me. At first I didn't answer him. Then I asked him what he wanted and he said he wanted his gun, and I said you have no use for it. He said I have got to have it because I have got to kill me a s. o. b. and I said, 'No, dad, you don't get this gun,' and he said you better give it to me because if you don't I will get you anyway because I am going to kill you. * * * Then he started in again and said, 'Josie are you going to open the door,' and I said, 'No, dad, I am not opening the door,' to which he said, 'You can open the door and save me breaking it, because I am coming in,' and cursed and said he was going to chop my head off and I begged him to go away from the door and he wouldn't go. I said, 'Please, dad, go away,' and he wouldn't do it and he hit the door and I said, 'If you hit the door again, you are going to break it down. I am going to ask you to go away and leave me alone,' and he said, 'I am coming in to get you,' and so he hit the door again and I shot; and he said 'Oh Lord, Oh Gosh you have hit me.' "

Appellant says that when her daughter then came up the stairs, she unlocked the door and went out and saw that he was pitching forward, when they put their

arms around him and laid him out. She further states that she then went in her torn dress to Pikeville, where she gave herself up and thereafter changed her dress, badly cut up, to a better one while in jail.

The commonwealth introduced the taxi driver who had taken her over to Pikeville as a witness, who stated that he had not noticed that the dress which she wore when he drove her was torn.

In this account of the tragedy given by appellant, she is corroborated by her daughter, who at the time it occurred was downstairs with friends, who also testify in corroboration of the appellant's version of the shooting of deceased when he was trying to gain entrance to her room. Also appellant's 9 year old son, who was in the room with her and heard and saw what then took place, testifies practically as his mother as to the material facts.

The character both of the appellant and some of her witnesses was to some extent impeached, when the jury was instructed that such impeachment testimony could only be considered by it for the purpose of affecting the weight and credibility of the testimony of the impeached witnesses.

Upon the conclusion of the evidence, appellant moved that the court peremptorily instruct the jury to acquit her, which was refused, and of which she now complains as erroneous.

We do not concur with this contention, however, as it was here admitted by defendant that she had shot and killed her ex-husband under circumstances and motivating cause, argued by the commonwealth to be in conflict with those claimed and testified to by the appellant.

The commonwealth contends that the physical evidence furnished by the condition of the door, upon which the deceased was stated by appellant to have rained blows with his wrecking bar, does itself contradict and show that the defendant's testimony as to this is untrue, as the door which she states he attempted to break open with the wrecking bar was found not to have been defaced with scars, as it is contended it needs must have been had the deceased tried to break through it as alleged, and it further contends that appellant did not shoot and kill deceased in her necessary

self-defense on this occasion, as testified by her, but that in so doing she was simply carrying out her earlier formed plans to get rid of or to kill the deceased, as she had upon several occasions threatened to do, according to the testimony of some of its witnesses.

Giving due regard to this situation of the evidence being to such extent conflicting, it is our conclusion that the court did not err in refusing to peremptorily instruct the jury to acquit the defendant.

However, we are equally clear of doubt as to the propriety of our conclusion reached, that the evidence of the commonwealth was palpably insufficient, when viewed in connection with the evidence introduced by the defendant, to support the jury's verdict finding her guilty of manslaughter, and it is our conclusion that the verdict was flagrantly against the evidence.

The claim of the commonwealth that appellant had threatened to kill or to get rid of the deceased was denied by appellant, who stated that the witnesses in so testifying had misquoted what she had said, as by her remark that she was going to get rid of deceased, she referred to the fact of her then pending suit for divorce, when she hoped she would be freed from him and his domination and be left in unmolested possession of the car if she bought it; also, that in making the further remark charged to her, she stated that she had only realized that if she continued to live with the deceased, when he was almost daily brutally mistreating her and threatening her life, that one of them would be killed.

The commonwealth does not undertake to contradict the evidence as to the cause and circumstances under which appellant and her witnesses state she shot and killed the deceased, believing herself to be then in great danger at his hands and that it was necessary to shoot him in order to protect her life.

The commonwealth's only answer to such evidence is its circumstantial evidence offered, to the effect that the scars left upon the door were too few and slight in number and kind as must necessarily have been left thereon had the deceased really attempted to break in the door, in the way and with the force appellant contends he did.

While physical facts of such character are force-

ful and may be of strong probative value in contradicting the testimony of the accused and her witnesses, the testimony given as to such physical facts is not properly to be here considered as being of such force as to put in issue appellant's contention that she was upon the occasion in evidence terrified by the assault made upon her door by the deceased, when threatening to break in and kill her. Neither was the fact as testified by the commonwealth witnesses merely that they did not see the wrecking bar or other weapons on the hall floor about the deceased, when they rushed to the scene of the shooting and found him lying in the hall, more or other than negative testimony indirectly contradicting the testimony of appellant and her witnesses that such wrecking bar was then lying beside or near the body of the deceased. None of the commonwealth's witnesses state that they at the time thought of or looked while there for the wrecking bar, nor is it unlikely that they would not at such time have noticed such a piece of iron lying in the hall, if it were there.

The long course of brutal treatment, blows, fiendish indignities and threats against her life, to which appellant was subjected, especially during the several months next before the killing of her ex-husband, very fully, if not conclusively, supports the contention of appellant that she was, at the time she states she was, in her locked room, and shot deceased, attempting to protect herself against his drunken and brutal assault which she then believed gravely threatened her life.

In the case of Jones v. Commonwealth, 241 Ky. 717, 44 S. W. (2d) 1075, 1076, the facts and circumstances there presented, under which the accused had shot and killed her father, were much analogous to those found in the instant case. There, in considering the sufficiency of the commonwealth's evidence to support a conviction, it was said:

"There is but slight, if any, conflict in the evidence. The testimony of all the eyewitnesses to the homicide was substantially to the effect that the appellant committed the homicide in self-defense. Ordinarily, the question of self-defense is one of fact to be determined by the jury under appropriate instructions, but, where the evidence in support of the right of self-defense on the part of the defendant is clear, positive, and uncontradicted

by either express testimony or by circumstances, it is the duty of the court to direct an acquittal. Patrick v. Commonwealth, 234 Ky. 33, 27 S. W. (2d) 387. In the instant case there was no material conflict in the evidence on this point. * * * The evidence without dispute shows that the deceased was a quarrelsome and brutal husband and father. He brought on the difficulty without provocation, and made a murderous attack upon appellant and her mother. Appellant was in great danger of losing her life or suffering great bodily harm at the hands of the deceased, and, not having provoked the difficulty, she was fully authorized under the circumstances in taking his life.''

In that case the court held there was no question for the jury to pass upon, and that the court should have sustained appellant's motion for a directed verdict, holding her not guilty.

However, as stated, supra, as appellant's testimony was here to some extent contradicted by the circumstances that the door did not show such defacement and scars as would be expected to be found, where it had been dealt the numerous blows with a wrecking bar, we are of the opinion that for such reason the evidence was conflicting, but only to so slight an extent as that appellant because of it was not entitled to a peremptory instruction. Such conclusion, however, does not militate against our further conclusion that such circumstantial and other evidence of the commonwealth was of too light and inconsequental a character to support the jury's verdict of guilty. The evidence of the appellant and her witnesses was, save in this one respect, uncontradicted and clearly showed without dispute that the deceased was drunk upon this occasion when trying to break into appellant's room, and that, when drinking, he was a quarrelsome and brutal husband, accustomed at such times to brutally assault, beat, and even threaten the life of appellant.

We, therefore, entertaining such view as to the low probative value of the evidence introduced by the commonwealth to establish appellant's guilt, and having also, on the other hand, after a careful consideration of the record, become mindful of the impressive probative effect and force of the evidence given on behalf of appellant, are convinced that although the verdict

found against her thereon cannot be attributed, as argued by counsel, to passion and prejudice aroused in the jury by the evidence heard against the appellant, detailing the facts and circumstances as to her killing the deceased, we are equally convinced that the verdict was without support or justification in the evidence.

In accord with such holding and supporting reason therefor, see Miller v. Commonwealth, 240 Ky. 300, 42 S. W. (2d) 334; Little v. Commonwealth, 245 Ky. 837, 842, 54 S. W. (2d) 388; Buster v. Commonwealth, 246 Ky. 322, 55 S. W. (2d) 18; Riley v. Commonwealth, 255 Ky. 68, 72 S. W. (2d) 754; Young v. Commonwealth, 260 Ky. 38, 83 S. W. (2d) 858.

We are, therefore, constrained to conclude, as was said in the case of Helton v. Commonwealth, 254 Ky. 290, 71 S. W. (2d) 625, that:

"On this evidence we could not in good conscience permit the conviction of this man to stand, and must therefore reverse the judgment because the verdict is flagrantly against the evidence."

The trial court should have sustained defendant's motion for a new trial on this ground. Judgment is reversed.