ARGUED AND DETERMINED

IN THE

# SUPREME JUDICIAL COURT

OF

# MASSACHUSETTS.

---

COMMONWEALTH *vs.* DANIEL J. COOPER.

Worcester. September 28, 1914. — October 22, 1914.

Present: RUGG, C. J., BRALEY, SHELDON, DE COURCY, & CROSBY, JJ.

*Practice, Criminal,* Conduct of trial. *Jury and Jurors. Homicide,* Mental responsibility.

During the empanelling of the jury at the trial of an indictment for murder in the first degree, after nine jurors had been accepted, the judge, in addressing the next person drawn as a juror who had expressed an unwillingness "to send a man to the chair," said, in the course of his remarks in regard to the duty of the judge and jury in capital cases, "Neither your life nor mine is safe unless we try capital cases." The juror, although declared qualified by the judge, was excluded on a peremptory challenge by the Commonwealth. The defendant was convicted of murder in the first degree, and alleged an exception to the words of the judge signifying in substance "Unless we try capital cases our lives are not safe," contending that the remark tended to prejudice the jury against him. *Held,* that it did not appear that the discretionary powers of the judge had been exercised to the defendant's prejudice.

At the trial of an indictment for murder in the first degree, where the elements of that crime as defined in R. L. c. 207, § 1, had been proved, unless the defendant was so deficient in reason as to be relieved from criminal responsibility, it appeared by the testimony of experts that the defendant was constitutionally defective or possessed of weak and diminished will power and self control, but the experts were not in agreement as to whether he lacked sufficient capacity to distinguish between right and wrong. The judge refused a request of the defendant to rule that, if "the jury find the defendant had the mental disorder called 'constitutional inferiority,' and if the jury find that such disorder carries with it a lim-

ited, that is, a diminished degree of responsibility for the act, he cannot be found guilty of murder in the first degree." *Held,* that the refusal of the ruling was proper.

At the trial of an indictment for murder in the first degree, upon the issue whether the defendant was so deficient in reason as to be relieved from criminal responsibility, it is proper for the presiding judge to refuse to allow the defendant to ask a witness, qualified as an expert, whether in his opinion the defendant appreciated the enormity of his crime.

A person abnormally deficient in will power and of retarded mental development, who has killed another person under circumstances that would constitute murder in the first degree if he was mentally responsible, upon an indictment for that crime can be found to have been fully conscious of the criminal character and consequences of his act. That question and also the question, whether he was so mentally diseased that he felt impelled to act by a power which overcame his reason and judgment and to him was irresistible, are questions of fact for the jury under proper instructions from the judge in regard to the law.

BRALEY, J. The defendant who has been convicted of the crime of murder in the first degree alleged exceptions at the trial to certain remarks of the presiding judge * made while the jurors were being empanelled, to the refusal to rule as requested, and to the exclusion of evidence. We shall consider these contentions in the order stated.

After nine jurors had been called, examined and accepted as required by R. L. c. 176, §§ 26, 28, the next juror drawn from the ballot box, upon being asked by the judge, "Are your opinions such as to prevent you from returning a verdict of guilty against the defendant for an offense punishable by death," answered in the affirmative. A colloquy followed, the evident object of which was an effort by the judge to ascertain whether the views of the juror were so firmly held that he could not vote for conviction even if satisfied upon the law and the evidence of the defendant's guilt. The juror still exhibiting by his answers that, while desirous of doing his full duty, "I would not want to send a man to the chair," the judge said, "None of us want to, but the question is whether we are willing to do what the law stands for, and be content to do our duty if the evidence and the law justifies it; that is the question. You must understand that it is not a desirable task for judge or jury to sit upon capital cases, but for the safety of the community it is our duty to act. Neither your life nor mine is safe unless we try capital cases, and now the question

---

* *Dubuque, J.*

is whether you have such a settled or set opinion as to capital punishment that would prevent you from giving a just verdict upon the law and evidence in the case." To this inquiry the juror replied in the negative, and, although declared by the court to be indifferent, he was peremptorily challenged by the Commonwealth under R. L. c. 176, § 29. But before the panel had been filled the defendant excepted to the words signifying in substance "unless we try capital cases our lives are not safe." It is urged that the remark tended to prejudice the jury against him. The words, however, are not to be wrenched from the context, and no comment on the case the jury were to hear, or any reference to the defendant had been made. The judge manifestly desired to impress upon the juror the necessity of a due and proper administration of the laws, and to make clear to him that his refusal to perform the duty for which he had been summoned because performance might be disagreeable and against his conception of what the law ought to be, would prevent, if a sufficient number of the community eligible for service as jurors adhered to a like opinion, the conviction and punishment of those guilty of the crime charged. It was not an attempt to override the will of the juror or to coerce his judgment; or intended to influence in any degree the action of the jurors already selected or the jury as finally empanelled. The discretionary powers of the court do not appear to us to have been exercised to the defendant's prejudice, and the judge moreover in his instructions left to the jury the defendant's guilt or innocence as a question of fact solely within their province. *Commonwealth* v. *Johnson,* 188 Mass. 382, 385.

It was uncontroverted that the defendant killed the decedent. Indeed as a witness in his own behalf he gave his version of the details. The evidence for the Commonwealth was wholly derived from alleged statements made by him at various times to the arresting officers and to most of the alienists who were called as witnesses. The jury could find from this testimony that on the morning of the homicide the defendant, while sitting in the kitchen of his own home, looked through a window and saw the decedent, of whom he had become jealous, at the door of the house occupied by a woman with whom the defendant had been for a long time criminally intimate. Immediately he went upstairs and, taking a revolver which he had been licensed to carry,

passed out of the house, going through the fields and woods to a cart road where he concealed himself, and as the decedent turned into the road the defendant fired three times, each shot striking the decedent in the back. The defendant's testimony varied the narrative only in the statement that the decedent as he came up called him a vile name, made threats, and then advanced toward him, and that, when he came within a couple of feet, he drew his revolver and fired once. The decedent then turned and ran, when the defendant fired two shots, the last of which took effect. But there is no variation in the evidence that after the slaying the defendant dragged the body from the road into the bushes, and in the early morning of the next day buried it near the place where it had been left. If the jury upon all the evidence were convinced beyond a reasonable doubt that the mortal shot was fired with "deliberately premeditated malice aforethought," the elements of murder in the first degree as defined by R. L. c. 207, § 1, had been proved, unless the defendant was so deficient in reason as to be relieved from criminal responsibility. *Commonwealth* v. *Tucker*, 189 Mass. 457.

The principal if not the only contest was over this question. By the fourteenth request the defendant asked for a ruling that, if "the jury find the defendant had the mental disorder called 'constitutional inferiority,' and if the jury find that such disorder carries with it a limited, that is, a diminished degree of responsibility for the act, he cannot be found guilty of murder in the first degree." The consensus of opinion of the alienists, based upon his family history and their examinations, classified him as constitutionally defective, or possessed of weak and diminished will power and self control, although they were not agreed that he lacked sufficient capacity to distinguish "between right and wrong." It is clear that, unless *Commonwealth* v. *Rogers*, 7 Met. 500, reaffirmed and followed in *Commonwealth* v. *Johnson*, 188 Mass. 382, 388, is to be overruled, the ruling requested should not have been given; and the question to Dr. Quimby, "From your examination of the defendant, from the history of the family as testified to in court, and from what you have learned from the defendant, and from the evidence you have learned during the trial, did the defendant in your opinion appreciate the enormity of his crime," was excluded properly.

The inquiry as to the defendant's responsibility is to be directed solely to his state of mind at the time of the homicide. To ascertain this his family history and mental condition both before and after the act may be fully inquired into and introduced in evidence. *Baxter* v. *Abbott,* 7 Gray, 71. But the question is not to be finally settled by medical science or by legal definition from the bench, although each may be of material assistance to a jury. It is the duty of the judge to state clearly and sufficiently what the jury are to decide by a careful discrimination between the law and the facts which they may find upon the evidence. The defendant, even if abnormally deficient in will power and of retarded mental development, could be found still to have been fully conscious of the criminal character and consequences of his act. It also was a pure question of fact whether he was so mentally diseased that he felt impelled to act by a power which overcame his reason and judgment, and which to him was irresistible. *Commonwealth* v. *Rogers,* 7 Met. 500, 501. *Commonwealth* v. *Presby,* 14 Gray, 65, 67. *Hopps* v. *People,* 31 Ill. 385, 391, 392. *Sayres* v. *Commonwealth,* 88 Penn. St. 291, 299. *People* v. *Finley,* 38 Mich. 482, 483. *State* v. *Jones,* 50 N. H. 369. To quote from *Commonwealth* v. *Rogers:* "In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plain dictates of justice and right, injurious to others, and a violation of the dictates of duty." If found to be irresponsible the defendant was entitled to a verdict of not guilty by reason of insanity; but his irresponsibility would not reduce the degree of crime. *Commonwealth* v. *Wireback,* 190 Penn. St. 138. What should be the working rule whereby the jury are to be guided? It is thus stated in *Commonwealth* v. *Rogers:* "If then it is proved, to the satisfaction of the jury, that the mind of the accused was in a diseased and unsound state, the question will be, whether the disease existed to so high a degree, that for the time being it overwhelmed the reason, conscience, and judgment, and whether the prisoner, in committing the homicide, acted from an irresistible and uncontrollable impulse: If so, then the act was not the act of a voluntary agent, but the involuntary act of the body, without the concurrence of a mind directing it." The very full and impartial instructions to the jury were in harmony with this

doctrine. They were instructed, that with the burden of proof on the prosecution to show that he was criminally responsible, the defendant could not be convicted if from mental disease he was unable to form a criminal intent or purpose, and acted under an irresistible homicidal impulse. The twenty-fifth and twenty-sixth requests, that, "if the defendant was suffering from a mental disease called 'constitutional inferiority,' and if the jury find that in consequence of said mental disease his will power was diminished, the jury should inquire as to whether he had sufficient power to deliberately premeditate the commission of this crime, so as to be liable for murder in the first degree," and "if the jury find that in consequence ¡of suffering from 'constitutional inferiority' the defendant was overborne by some irresistible and uncontrollable impulse, springing from mental defectiveness or disease, to do the act which he knows to be wrong, he is not legally responsible and cannot be convicted of murder in the first degree," except as covered by the instructions, were properly denied. *Commonwealth* v. *Spencer*, 212 Mass. 438.

*Exceptions overruled.*

*J. E. Swift*, for the defendant.

*J. A. Stiles*, District Attorney, (*E. T. Esty*, Assistant District Attorney with him,) for the Commonwealth.