## FISHER *v.* UNITED STATES.

No. 122.   Argued December 5, 1945.—Decided June 10, 1946.

*Charles H. Houston* argued the cause and filed a brief for petitioner.

*Charles B. Murray* argued the cause for the United States.  *Solicitor General McGrath, W. Marvin Smith, Robert S. Erdahl* and *Leon Ulman* were on the brief.

464

Mr. Justice Reed delivered the opinion of the Court.

This writ of certiorari brings here for review the sentence of death imposed upon petitioner by the District Court of the United States for the District of Columbia after a verdict of guilty on the first count of an indictment which charged petitioner with killing by choking and strangling Catherine Cooper Reardon, with deliberate and premeditated malice. The United States Court of Appeals for the District of Columbia affirmed the judgment and sentence of the District Court. 80 U. S. App. D. C. 96, 149 F. 2d 28.

The errors presented by the petition for certiorari and urged at our bar were, in substance, that the trial court refused to instruct the jurors that they should consider the evidence of the accused's psychopathic aggressive tendencies, low emotional response and borderline mental deficiency to determine whether he was guilty of murder in the first or in the second degree. The aggregate of these factors admittedly was not enough to support a finding of not guilty by reason of insanity.[1] Deliberation and

---

[1] The Code of Law for the District of Columbia (1940 Ed.) provides as follows:

Title 22, § 2401, "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in attempting to perpetrate any arson, as defined in section 22–401 or 22–402 of this Code, rape, mayhem, robbery, or kidnapping, or in perpetrating or in attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree."

Title 22, § 2403, "Whoever with malice aforethought, except as provided in sections 22–2401, 22–2402, kills another, is guilty of murder in the second degree."

Title 22, § 2404, "The punishment of murder in the first degree shall be death by electrocution. The punishment of murder in the second degree shall be imprisonment for life, or for not less than twenty years."

premeditation are necessary elements of first degree murder.

Considerations as to the exercise of authority by this Court over the courts of the District of Columbia in the interpretation of local criminal statutes induced us to grant the writ in view of the issue presented. Judicial Code, § 240 (a).

The homicide took place in the library building on the grounds of the Cathedral of Saint Peter and Saint Paul, Washington, D. C., between eight and nine o'clock, a. m., on March 1, 1944. The victim was the librarian. She had complained to the verger a few days before about petitioner's care of the premises. The petitioner was the janitor. The verger had told him of the complaint. Miss Reardon and Fisher were alone in the library at the time of the homicide. The petitioner testified that Miss Reardon was killed by him immediately following insulting words from her over his care of the premises. After slapping her impulsively, petitioner ran up a flight of steps to reach an exit on a higher level but turned back down, after seizing a convenient stick of firewood, to stop her screaming. He struck her with the stick and when it broke choked her to silence. He then dragged her to a lavatory and left the body to clean up some spots of blood on the floor outside. While Fisher was doing this cleaning up, the victim "started hollering again." Fisher then took out his knife and stuck her in the throat. She was silent. After that he dragged her body down into an adjoining pump pit, where it was found the next morning. The above facts made up petitioner's story to the jury of the killing.

It may or may not have been accepted as a whole by the jury. Other evidence furnishes facts which may have led the jury to disbelieve some of the details of accused's version of the tragedy. In his original confession, the

accused made no reference to Miss Reardon's use of insulting words. In his written confession, they were mentioned. In his testimony their effect upon him was amplified. There are minor variations between Fisher's written confession and his testimony. In the written confession Fisher admitted that his main reason for assaulting Miss Reardon was because she reported him for not cleaning the library floor. The Deputy Coroner said the knife wound was not deep, "just went through the skin."

The effort of the defense is to show that the murder was not deliberate and premeditated; that it was not first but second degree murder. A reading of petitioner's own testimony, summarized above, shows clearly to us that there was sufficient evidence to support a verdict of murder in the first degree, if petitioner was a normal man in his mental and emotional characteristics. Cf. *Bostic* v. *United States,* 68 App. D. C. 167, 94 F. 2d 636, 638. But the defense takes the position that the petitioner is fairly entitled to be judged as to deliberation and premeditation, not by a theoretical normality but by his own personal traits. In view of the status of the defense of partial responsibility in the District and the nation no contention is or could be made of the denial of due process. It is the contention of the defense that the mental and emotional qualities of petitioner were of such a level at the time of the crime that he was incapable of deliberation and premeditation although he was then sane in the usual legal sense. He knew right from wrong. See *M'Naghten's Case,* 10 Cl. & Fin. 200, 210. His will was capable of controlling his impulses. *Smith* v. *United States,* 59 App. D. C. 144, 36 F. 2d 548. Testimony of psychiatrists to support petitioner's contention was introduced. An instruction charging the jury to consider the personality of the petitioner in determining intent, premeditation and deliberation was sought and refused.

From the evidence of the psychiatrists for the defense, the jury might have concluded the petitioner was mentally somewhat below the average with minor stigmata of mental subnormalcy. An expert testified that he was a psychopathic personality [2] of a predominantly aggressive type. There was evidence that petitioner was unable by reason of a deranged mental condition to resist the impulse to kill Miss Reardon. All evidence offered by the defense was accepted by the trial court. The prosecution had competent evidence that petitioner was capable of understanding the nature and quality of his acts. Instructions in the usual form were given by the court submitting to the jury the issues of insanity, irresistible impulse, malice, deliberation and premeditation. Under these instructions, set out below, the jury could have determined from the evidence that the homicide was not the result of premeditation and deliberation.[3]

Although no objection as to the form of these instructions is urged here by counsel for petitioner, this Court in a criminal case may notice material error within its power

---

[2] "The only conclusion that seems warrantable is that, at some time or other and by some reputable authority, the term psychopathic personality has been used to designate every conceivable type of abnormal character." Curran and Mallinson, Psychopathic Personality (1944), 90 J. Ment. Sci. 278.

[3] These instructions were given:

*Insanity.* "In behalf of the defendant, it is contended that he was insane, and therefore not legally responsible, hence should be acquitted by reason of insanity.

"It is further contended that even if sane and responsible, there was no deliberate intent to kill, nor in fact any actual intent to kill. Therefore if not guilty by reason of insanity, the defendant at most is guilty only of second degree murder or manslaughter, according as you may find he acted with or without malice.

   .      .      .      .      .

"Insanity, according to the criminal law, is a disease or defect of the mind which renders one incapable to understand the nature and quality of his act, to know that it is wrong, to refrain from doing the

to correct, even though that error is not specifically challenged, and certainly should do so, even in cases from the District of Columbia, where life is at stake. *Brasfield* v. *United States*, 272 U. S. 448; compare Rules 54 (a) (1), 59, 52 (b), Rules of Criminal Procedure. It is suggested

---

wrongful act. There must be actual disease or defect of the mental faculties, so far impairing the reason or will that this test of sanity cannot be met, before one is relieved of his criminal act.

"The fatal actions must be traceable back to a diseased or deranged mentality."

*Irresistible impulse.* "Here it is contended that although the defendant may have understood what he was doing when he assaulted Miss Reardon, and may have known it was wrong, yet he was impelled by an irresistible impulse to do the violent acts which caused her death.

"If the defendant was suffering from a diseased condition of his mental faculties, which so far destroyed his will, the governing power of the mind, that his actions were not subject to the will, but beyond its control, then in legal contemplation, he was insane and not responsible, though he may have understood the nature of those acts, and have been conscious of their wrong.

"If, as I have said, there was such lack of willpower and control it must have been the result of a disease or disorder of the mental faculties. Mere loss of moral restraints leading to a surrender to criminal thoughts and passions is not enough."

*Malice; Deliberation; Premeditation.* "I have stated that the indictment presents within its terms the three degrees of unlawful homicide—murder in the first degree, murder in the second degree, and manslaughter.

"I shall explain them in that order.

"Murder in the first degree is the killing of a human being purposely and with deliberate and premeditated malice. The crime involves these elements:

"First, the fatal act purposely done. Of that, nothing more need be said.

"Second, malice.

"Third, premeditation.

"Fourth, deliberation.

"All these are elements which go to constitute the crime of murder

by a dissent that these instructions, just quoted in note 3, did not bring "sharply and vividly to the jury's mind" the issue of premeditation; that they "consisted of threadbare generalities, a jumble of empty abstractions." We think the contention advanced is that the district judge should

in the first degree. Therefore, each and all must be established by the evidence beyond a reasonable doubt.

"Malice is a basic element of murder in both the first and the second degrees.

"In common parlance, the word signifies feelings of anger, hatred, or illwill. Such feelings, may, of course, actuate the killing of a human being, and often do.

"However, the law has given to the term 'malice' a special meaning. It is the intentional doing of a wrongful act to the injury of another under circumstances which do not legally justify or palliate the act.

"As applied to the crime of murder, malice is the intentional striking of a deadly blow in execution of an evil purpose springing from a heart regardless of social duty and fatally bent on mischief.

"Then, there is the element of premeditation. That is, giving thought, before acting, to the idea of taking a human life and reaching a definite decision to kill. In short, premeditation is the formation of a specific intent to kill.

"Deliberation, that term of which you have heard much in the arguments and one of the elements of murder in the first degree, is consideration and reflection upon the preconceived design to kill; turning it over in the mind; giving it second thought.

"Although formation of a design to kill may be instantaneous, as quick as thought itself, the mental process of deliberating upon such a design does require that an appreciable time elapse between formation of the design and the fatal act within which there is, in fact, deliberation.

"The law prescribes no particular period of time. It necessarily varies according to the peculiar circumstances of each case. Consideration of a matter may continue over a prolonged period—hours, days, or even longer. Then again, it may cover but a brief span of minutes. If one forming an intent to kill does not act instantly, but pauses and actually gives second thought and consideration to the intended act, he has, in fact, deliberated. It is the fact of deliberation that is important, rather than the length of time it may have continued."

have specifically referred to the words of insult or have elaborated upon the details of the evidence in his charge with respect to premeditation. With such a requirement for instructions we do not agree. The evidence furnishes the factual basis for a jury's conclusion as to guilt and its degree, guided by the instructions of the court as to the law.[4] Premeditation and deliberation were defined carefully by the instructions. The contention of the accused that there was no deliberation or premeditation was called distinctly to the jury's attention. The necessary time element was emphasized and the jury was told that premeditation required a preconceived design to kill, a "second thought." With the evidence and the law before them the jury reached its verdict. The instructions, we think, were clear, definite, understandable and applicable to the facts developed by the testimony. We see no error in them.

The error claimed by the petitioner is limited to the refusal of one instruction. The jury might not have reached the result it did if the theory of partial responsibility[5] for his acts which the petitioner urges had been submitted. Petitioner sought an instruction from the trial court which would permit the jury to weigh the evidence of his mental deficiencies, which were short of insanity in the legal sense, in determining the fact of and the accused's capacity for premeditation and deliberation.[6]

---

[4] *Stilson* v. *United States*, 250 U. S. 583, 588; *Starr* v. *United States*, 153 U. S. 614, 625; *Arwood* v. *United States*, 134 F. 2d 1007, 1011.

[5] The phrase is used herein to indicate responsibility for a lesser grade of offense. See Glueck, Mental Disorder and the Criminal Law (1925) 310, n. 1.

[6] The instruction requested reads as follows:

"The jury is instructed that in considering the question of intent or lack of intent to kill on the part of the defendant, the question of premeditation or no premeditation, deliberation or no deliberation, whether or not the defendant at the time of the fatal acts

The appellate court approved the refusal upon the alternate ground that an accused is not entitled to an instruction upon petitioner's theory.[7]   This has long been the law of the District of Columbia.[8]   This is made abundantly clear by *United States* v. *Lee,* 4 Mackey 489, 495. This also was a murder case in which there was evidence of mental defects which did not amount to insanity.   An instruction was asked and denied in the language copied in the margin.[9]

---

was of sound memory and discretion, it should consider the entire personality of the defendant, his mental, nervous, emotional and physical characteristics as developed by the evidence in the case."

Our conclusion does not require that we pass upon whether the instruction was correct if petitioner's theory is sound, or whether if incorrect, the judge should have recast the instruction in proper form. See the case below, 80 U. S. App. D. C. 96, 97, 149 F. 2d 28, 29 r. c. Compare *Freihage* v. *United States,* 56 F. 2d 127, 133, with *George* v. *United States,* 75 U. S. App. D. C. 197, 125 F. 2d 559, 563.

[7] *Fisher* v. *United States,* 80 U. S. App. D. C. 96, 97, 149 F. 2d 28, 29 l. c.

The Court of Appeals spoke of an acquittal under the proposed instruction.   The other language of the opinion and the refusal of the petition for rehearing, which pointed out the misuse of the word, shows clearly that a reduction in degree was meant, not an acquittal.

[8] Cf. *Guiteau's Case,* 10 F. 161, 168, 182; *Bolden* v. *United States,* 63 App. D. C. 45, 69 F. 2d 121; *Owens* v. *United States,* 66 App. D. C. 104, 85 F. 2d 270, 272.

[9] 4 Mackey 495–96:

The instruction requested was: "If the jury are not satisfied from the evidence that the defendant, at the time he committed the act, was so mentally unsound as to render him incapable of judging between right and wrong; yet if the jury find from the evidence that there was such a degree of mental unsoundness existing at the time of the homicide as to render the defendant incapable of premeditation and of forming such an intent as the jury believe the circumstances of this case would reasonably impute to a man of sound mind, they may consider such degree of mental unsoundness in determining the question whether the act was murder or manslaughter."

The court said: "It rests upon the idea that there is a grade of

It is suggested that the *Lee* case was decided when murder under the District law was not divided into degrees and that therefore it was not proper to instruct as to the accused's mental capacity to premeditate and deliberate while now it would be. We do not agree. The separation of the crime of murder into the present two degrees by the Code of Law for the District of Columbia, March 3, 1901, 31 Stat. 1189, 1321, is not significant in analyzing the necessity for the proposed submission of the evidence concerning petitioner's mental and emotional characteristics to the jury by specific instruction. The reason for the change, doubtless, lay in the wide range of atrocity with which the crime of murder might be committed so that Congress deemed it desirable to establish grades of punishment. Cf. *Davis* v. *Utah Territory,* 151 U. S. 262, 267, 270. Homicide, at common law, the rules of which were applicable in the District of Columbia, had degrees. Murder was "with malice aforethought, either express or implied." Blackstone, Book IV (Lewis ed.,

---

insanity not sufficient to acquit the party of the crime of manslaughter and yet sufficient to acquit him of the crime of murder.

"The law does not recognize any such distinction as that in the forms of insanity. The rule of law is very plain that in order that the plea of insanity shall prevail, there must have been that mental condition of the party which disabled him from distinguishing between right and wrong in respect of the act committed.

"Now if the prisoner was so far capable of distinguishing between right and wrong as to be guilty of the crime of manslaughter, he surely was capable of distinguishing between right and wrong in respect of the crime of murder of the identical party. There can be no recognition of the doctrine that a man is incapable of distinguishing between right and wrong so as to determine that the case is not a case of murder, and yet capable of distinguishing between right and wrong so as to be guilty of manslaughter. There is no such doctrine, and nothing in the books that favors any such idea. The prayer therefore is unsound in all respects, and even if it had been sound, not being supported by evidence, the court below was entirely justified in rejecting it."

1902), p. 195; see *Hill* v. *United States,* 22 App. D. C. 395, 401; *Hamilton* v. *United States,* 26 App. D. C. 382, 386–91; *Burge* v. *United States,* 26 App. D. C. 524, 527–30. Manslaughter was unlawful homicide without malice. Blackstone, Book IV (Lewis ed., 1902), p. 191. As capacity of a defendant to have malice would depend upon the same kind of evidence and instruction which is urged here,[10] it cannot properly be said that the separation of murder into degrees introduced a new situation into the law of the District of Columbia.[11] As shown by the action of the District of Columbia courts in this case and the other District cases cited in this and the preceding paragraph, we think it is the established law in the District that an accused in a criminal trial is not entitled to an instruction based upon evidence of mental weakness, short of legal insanity, which would reduce his crime from first to second degree murder.

Petitioner urges forcefully that mental deficiency which does not show legal irresponsibility should be declared by this Court to be a relevant factor in determining whether an accused is guilty of murder in the first or second degree, upon which an instruction should be given, as requested. It is pointed out that the courts of certain states have adopted this theory. Others have rejected it.[12] It is urged, also, that since evidence of intoxication

---

[10] See *Hart* v. *United States,* 76 U. S. App. D. C. 193, 130 F. 2d 456, 458; *Bishop* v. *United States,* 71 App. D. C. 132, 107 F. 2d 297, 302–3; *McHargue* v. *Commonwealth,* 231 Ky. 82, 21 S. W. 2d 115; *State* v. *Eaton,* 154 S. W. 2d 767 (Mo.).

[11] The reference to the establishment of degrees of murder in *Hopt* v. *People,* 104 U. S. 631, 634, may indicate a different point of view. The Court was there considering intoxication under a statutory requirement that the intoxication should be taken into consideration by the jury in determining the degree of the offense.

[12] We are indebted to the respondent's brief for the collection of cases. Those accepting the petitioner's theory are: *Andersen* v. *State,* 43 Conn. 514, 526 (1876); *State* v. *Johnson,* 40 Conn. 136, 143–44

474

to a state where one guilty of the crime of murder may not be capable of deliberate premeditation requires in the District of Columbia an instruction to that effect (*McAffee* v. *United States,* 72 App. D. C. 60, 111 F. 2d 199, 205 r. c.), courts from this must deduce that disease and congenital defects, for which the accused may not

(1873); *Fisher* v. *People,* 23 Ill. 283, 295 (1860); *Donahue* v. *State,* 165 Ind. 148, 156, 74 N. E. 996 (1905); *Aszman* v. *State,* 123 Ind. 347, 356, 24 N. E. 123 (1890); *Rogers* v. *Commonwealth,* 96 Ky. 24, 28, 27 S. W. 813 (1894); *Mangrum* v. *Commonwealth,* 19 Ky. Law Rep. 94, 39 S. W. 703 (1897); *Commonwealth* v. *Trippi,* 268 Mass. 227, 231, 167 N. E. 354 (1929); *State* v. *Close,* 106 N. J. L. 321, 324, 148 A. 764 (1930); *State* v. *Schilling,* 95 N. J. L. 145, 148, 112 A. 400 (1920); *People* v. *Moran,* 249 N. Y. 179, 180, 163 N. E. 553 (1928); *Jones* v. *Commonwealth,* 75 Pa. 403, 408, 410 (1874); *State* v. *Green,* 78 Utah 580, 602, 6 P. 2d 177 (1931); *State* v. *Anselmo,* 46 Utah 137, 145, 157, 148 P. 1071 (1915); *Dejarnette* v. *Commonwealth,* 75 Va. 867, 880–81 (1881); *Hempton* v. *State,* 111 Wisc. 127, 135, 86 N. W. 596 (1901).

Those rejecting it are: *United States* v. *Lee,* 15 D. C. (4 Mackey) 489, 495–96 (1886); *Foster* v. *State,* 37 Ariz. 281, 289–90, 294 P. 268 (1930); *Bell* v. *State,* 120 Ark. 530, 557–58, 180 S. W. 186 (1915); *People* v. *French,* 12 Cal. 2d 720, 738, 87 P. 2d 1014 (1939); *People* v. *Cordova,* 14 Cal. 2d 308, 311–12, 94 P. 2d 40 (1939); *People* v. *Troche,* 206 Cal. 35, 47, 273 P. 767 (1928); *State* v. *Van Vlack,* 57 Idaho 316, 360–67, 65 P. 2d 736 (1937); *Sage* v. *State,* 91 Ind. 141, 144–45 (1883); *Spencer* v. *State,* 69 Md. 28, 41–43, 13 A. 809 (1888); *Commonwealth* v. *Cooper,* 219 Mass. 1, 5, 106 N. E. 545 (1914); *State* v. *Holloway,* 156 Mo. 222, 231, 56 S. W. 734 (1900); *State* v. *Rodia,* 132 N. J. L. 199, 39 A. 2d 484 (1944); *State* v. *Noel,* 102 N. J. L. 659, 676–77, 133 A. 274 (1926); *State* v. *James,* 96 N. J. L. 132, 149–51, 114 A. 553 (1921); *State* v. *Maioni,* 78 N. J. L. 339, 74 A. 526 (1909); *Sindram* v. *People,* 88 N. Y. 196, 200–201 (1882); *Commonwealth* v. *Barner,* 199 Pa. 335, 342, 49 A. 60 (1901); *Commonwealth* v. *Hollinger,* 190 Pa. 155, 160, 42 A. 548 (1899); *Commonwealth* v. *Wireback,* 190 Pa. 138, 151–52, 42 A. 542 (1899); *Jacobs* v. *Commonwealth,* 121 Pa. 586, 592–93, 15 A. 465 (1888); *Commonwealth* v. *Scott,* 14 Pa. D. & C. Rep. 191 (1930); *Witty* v. *State,* 75 Tex. Cr. Rep. 440, 457, 171 S. W. 229 (1914); *Hogue* v. *State,* 65 Tex. Cr. Rep. 539, 542, 146 S. W. 905 (1912); *State* v. *Schneider,* 158 Wash. 504, 510–11, 291 P. 1093 (1930).

be responsible, may also reduce the crime of murder from first to second degree. This Court reversed the Supreme Court of the Territory of Utah for failure to give a partial responsibility charge upon evidence of drunkenness in language which has been said to be broad enough to cover mental deficiency. *Hopt* v. *People,* 104 U. S. 631, 634.[13] It should be noted, however, that the Territory of Utah had a statute specifically establishing such a rule.[14]

No one doubts that there are more possible classifications of mentality than the sane and the insane. White, Insanity and the Criminal Law 89. Criminologists and psychologists have weighed the advantages and disadvantages of the adoption of the theory of partial responsibility as a basis of the jury's determination of the degree of crime of which a mentally deficient defendant may be guilty.[15] Congress took a forward step in defining the degrees of murder so that only those guilty of deliberate

---

[13] 104 U. S. at 634: "But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness or otherwise, as to be capable of deliberate premeditation, necessarily becomes a material subject of consideration by the jury."

See Edwin R. Keedy, Insanity and Criminal Responsibility, 30 Harv. L. Rev. 535 at 552.

The cases cited by this Court to support this statement are all instances of intoxication. Since drunkenness alone is specifically mentioned, the "or otherwise" may refer to various stages of intoxication.

[14] See 104 U. S. 631 at 634.

[15] Wharton, Criminal Law (12th ed.), vol. 1, § 64; Weihofen, Insanity as a Defense in Criminal Law (1933), pp. 100–103; Weihofen, Partial Insanity and Criminal Intent, 24 Ill. Law Rev. 505 (1930); Keedy, Insanity and Criminal Responsibility, 30 Harv. Law Rev. 535, 552–554 (1917); Mental Abnormality and Crime, English Studies in Criminal Science (1944), pp. 61–63; Glueck, Mental Disorder and the Criminal Law (1925), pp. 199–208; Hall, Mental Disease and Criminal Responsibility, 45 Col. Law Rev. 677 (1945).

and premeditated malice could be convicted of the first degree. It may be that psychiatry has now reached a position of certainty in its diagnosis and prognosis which will induce Congress to enact the rule of responsibility for crime for which petitioner contends. For this Court to force the District of Columbia to adopt such a requirement for criminal trials would involve a fundamental change in the common law theory of responsibility.

We express no opinion upon whether the theory for which petitioner contends should or should not be made the law of the District of Columbia. Such a radical departure from common law concepts is more properly a subject for the exercise of legislative power or at least for the discretion of the courts of the District. The administration of criminal law in matters not affected by constitutional limitations or a general federal law is a matter peculiarly of local concern. Compare *McNabb* v. *United States,* 318 U. S. 332, with *Ashcraft* v. *Tennessee,* 322 U. S. 143, 156. This Court has in a less important matter undertaken to adjust by decision an outmoded rule of the common law to modern conditions. But when that step was taken, it was declared that "experience has clearly demonstrated the fallacy or unwisdom of the old rule." *Funk* v. *United States,* 290 U. S. 371, 381. See *Weiler* v. *United States,* 323 U. S. 606, 609.

Matters relating to law enforcement in the District are entrusted to the courts of the District. Our policy is not to interfere with the local rules of law which they fashion, save in exceptional situations where egregious error has been committed.

Where the choice of the Court of Appeals of the District of Columbia in local matters between conflicting legal conclusions seems nicely balanced, we do not interfere. *District of Columbia* v. *Pace,* 320 U. S. 698, 702; *Busby* v. *Electric Utilities Union,* 323 U. S. 72, 74–5. The policy

of deferring to the District's courts on local law matters is reinforced here by the fact that the local law now challenged is long established and deeply rooted in the District.

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

A shocking crime puts law to its severest test. Law triumphs over natural impulses aroused by such a crime only if guilt be ascertained by due regard for those indispensable safeguards which our civilization has evolved for the ascertainment of guilt. It is not enough that a trial goes through the forms of law. Especially where life is at stake it is requisite that the trial judge should so guide the jury that the jurors may be equipped to determine whether death should be the penalty for conduct. Of course society must protect itself. But surely it is not self-protection for society to take life without the most careful observance of its own safeguards against the misuse of capital punishment.

This case has been much beclouded by laymen's ventures into psychiatry. We are not now called upon to decide whether the antiquated tests set down more than a hundred years ago regarding mental responsibility for crime [1] are still controlling or whether courts should choose from among the conflicting proposals of scientific special-

---

[1] *M'Naghten's Case*, 10 Cl. & Fin. 200 (1843). More than sixty years ago Sir James Fitzjames Stephen brought weighty criticism to bear on the *M'Naghten* case. 2 Stephen, *A History of the Criminal Law of England* (1883) 153 *et seq.;* for more recent consideration of the case, see Glueck, *Mental Disorder and the Criminal Law* (1925) c. 6; Cardozo, *What Medicine Can Do For Law* (1930) 28–35.

ists.[2]  This is not the occasion to decide whether the only
alternative is between law which reflects the most ad-
vanced scientific tests and law remaining a leaden-footed
laggard.   The case turns on a much simpler and wholly
conventional issue.   For the real question, as I see it, is
whether in view of the act of Congress defining murder
in the first degree for prosecutions in the District and in
light of the particular circumstances of this case, the trial
court properly sent the case to the jury.   That is a very
different question from whether the court's charge was
unimpeachable as an abstract statement of law.   For
Fisher is not the name of a theoretical problem.   We are
not hear dealing with an abstract man who killed an
abstract woman under abstract circumstances and received
an abstract trial on abstract issues.   Murder cases are apt
to be peculiarly individualized, and this case has its own
distinctive features.   It is in the light of these that we
must decide whether Fisher's death sentence should
legally stand.

According to the more enlightened rule, appellate courts
may review the facts in a capital case.[3]   Were such the

[2] See, e. g., White, *Insanity and the Criminal Law* (1923); Abraham-
sen, *Crime and the Human Mind* (1944); Lindner, *Rebel Without A
Cause* (1944); Radzinowicz & Turner, eds., *Mental Abnormality and
Crime* (1944); Reik, *The Unknown Murderer* (1945); see also, Hall,
*Mental Disease and Criminal Responsibility* (1945) 45 Col. L. Rev.
677, 680–84, and authorities cited therein.

[3] See, e. g., Annotated Laws of Massachusetts, c. 278, § 33E; *Com-
monwealth* v. *Gricus*, 317 Mass. 403, 406, 58 N. E. 2d 241; *Massachu-
setts Judicial Council, Third Report* (1927) 40–43, 131–35; *Massa-
chusetts Judicial Council, Thirteenth Report* (1937) 28–30; New York
Constitution, Article 6, § 7; *People* v. *Crum*, 272 N. Y. 348, 6 N. E.
2d 51; Cardozo, *Jurisdiction of the Court of Appeals* (2d ed., 1909)
§ 51; American Law Institute, *Code of Criminal Procedure* (Official
Draft, 1930) § 457 (2); Orfield, *Criminal Appeals in America* (1939)
83 *et seq.*

The reasons for such review are succinctly stated in the *Thirteenth
Report of the Massachusetts Judicial Council, supra,* at 29: "In

scope of our review of death sentences, I should think it would be hard to escape what follows as the most persuasive reading of the record.

Fisher had learned from his boss of Miss Reardon's complaint about the slackness of his work. On the fatal morning, Miss Reardon told Fisher that he was not doing the work for which he was being paid, and in the course of her scolding called him a "black nigger." This made him angry—no white person, he claimed, had ever called him that—and he struck her. She ran screaming towards the window in the back of the room. Fisher ran out of the room and up the stairs. Her screaming continued. At the top of the stairs he saw a pile of wood lying by the fireplace. He seized a piece of wood, ran down the stairs and struck her on the head. The stick broke and he seized her by the throat. She continued to scream until she went limp. He then dragged her to the lavatory and left her there while he went back to clean up the spots of blood. She recovered sufficiently to scream again, and he returned to the lavatory and cut her slightly with a knife he carried in his pocket. The importance of the screaming is a key to the tragedy. It is difficult to disbelieve Fisher's account that he never wanted to kill Miss Reardon but wanted only to stop her screaming, which unnerved him.

> "She ran out from behind her desk, down toward the back, screaming."

---

substance this [denial of the right to consider the facts by the appellate court] means that there is no review of the discretion of the single judge. Thus a matter of life or death, once treated [in Massachusetts] with the utmost care, even beyond the requirements of the law, has now been committed to a single judge of the Superior Court, with no review whatever on its most vital aspects. Such a situation places an unfair responsibility upon the trial judge and upon the governor, is a potential threat to justice and is not reassuring to the public who have a right to demand that judicial consideration should be exhausted before a man is condemned to death."

"The screaming seemed to have gotten on my nerves."

"I was running on up the steps, with her all the time screaming."

"She was still screaming, and I began choking her then."

"I was just trying to keep her from making a noise."

". . . she started hollering and I tried to stop her from hollering."

"Then I began choking her because she was still hollering."

". . . I did not strike her any more after the noise had ceased."

". . . she started hollering again."

"She kept hollering, seemed like to me."

"My idea was just trying to stop her from hollering, is all I can think about."

"After that she stopped hollering."

The next day he started to go to the Cathedral to work as usual. He made two attempts to enter the Cathedral grounds. About the first, he said he got "nervous and shaky, and [he] couldn't go in there." Later he "kept thinking about what [he] had done to her. [He] didn't know whether she was dead or alive. [He] was afraid to go up there and tell them that [they] had had an argument or a fight." When apprehended by two detectives, he said he "had some trouble with the lady out at the Cathedral."

The evidence in its entirety hardly provides a basis for a finding of premeditation. He struck Miss Reardon when she called him "black nigger." He kept on when her screaming frightened him. He did not know he had killed her. There is not the slightest basis for finding a motive for the killing prior to her use of the offensive phrase. Fisher, to be sure, had Miss Reardon's ring in

his possession. But it came off in his hand while he was dragging her, and he put it away when he reached home to conceal its possession from his wife. He did not run away and he cleaned up the blood "because [he] didn't want to leave the library dirty, leave awful spots on the floor. [He] wanted to clean them up." He treated the spots on the floor not as evidence of crime but as part of his job to keep the library clean. Fisher was curiously unconnected with the deed, unaware of what he had done. His was a very low grade mentality, unable to realize the direction of his action and its meaning. His whole behavior seems that of a man of primitive emotions reacting to the sudden stimulus of insult and proceeding from that point without purpose or design. Premeditation implies purpose and purpose is excluded by instantaneous action. Fisher's response was an instinctive response to provocation, and premeditation means nothing unless it precludes the notion of an instinctive and uncalculated reaction to stimulus. Accordingly, if existing practice authorized us to review the facts in a capital case I should be compelled to find that the ingredients of murder in the first degree were here lacking. I would have to find that the necessary premeditation and deliberation for the infliction of a death sentence were wanting, as did the New York Court of Appeals in a case of singularly striking similarity. *People* v. *Caruso,* 246 N. Y. 437, 159 N. E. 390. It is significant that the Court of Appeals for the District of Columbia has heretofore deemed it within its duty to examine the evidence in order to ascertain whether a finding of premeditation and deliberation was justified. *Bullock* v. *United States,* 74 App. D. C. 220, 122 F. 2d 213.

But while it is not now this Court's function to interpret the facts independently,[4] the jury, under guidance appro-

---

[4] As to certain classes of litigation that come here, this Court has, of course, always had power to review the evidence. *E. g.,* "[Since] by an appeal, except when specially provided otherwise, the entire

priate for a murder case, might well have so interpreted
them because the facts are persuasively so interpretable.
If, under adequate instructions, it could have so found,
the homicide falls outside the requirements for a finding
of murder in the first degree. Congress in 1901 enacted
a code for the District in which it joined the growing move-
ment of dividing murder into degrees.[5] Congress con-
fined the death sentence to killing by premeditation; it
required designed homicide, previous deliberation that life
was to be taken, before the United States would take life
in retribution.[6] The division of murder into degrees arose

---

case on both law and facts is to be reconsidered, there seems to be
little doubt that, so far as it is essential to a proper decision of this
case, the appeal requires us to examine into the evidence brought
to sustain or defeat the right of the petitioner to his discharge."
*In re Neagle,* 135 U. S. 1, 42.

[5] District of Columbia Code (1940) § 22–2401: "Whoever, being
of sound memory and discretion, kills another purposely, either of
deliberate and premeditated malice or by means of poison, or in
perpetrating or attempting to perpetrate any offense punishable by
imprisonment in the penitentiary, or without purpose so to do kills
another in perpetrating or in attempting to perpetrate any arson,
as defined in section 22–401 or 22–402 of this Code, rape, mayhem,
robbery, or kidnapping, or in perpetrating or in attempting to per-
petrate any housebreaking while armed with or using a dangerous
weapon, is guilty of murder in the first degree."

§ 22–2402: "Whoever maliciously places an obstruction upon a
railroad or street railroad, or displaces or injures anything appertain-
ing thereto, or does any other act with intent to endanger the passage
of any locomotive or car, and thereby occasions the death of another,
is guilty of murder in the first degree."

§ 22–2403: "Whoever with malice aforethought, except as provided
in sections 22–2401, 22–2402, kills another, is guilty of murder in the
second degree."

[6] The legislative history of these sections is meagre. The separa-
tion of the crime of murder into two degrees seems to have been first
proposed for the District in the Code of 1857. C. 130, §§ 1–2. That
Code was never enacted by Congress. The present provisions are

from the steadily weakened hold of capital punishment on the conscience of mankind. See Calvert, *Capital Punishment in the Twentieth Century* (5th ed., 1936); *Report from the Select Committee of the House of Commons on Capital Punishment, and Minutes of Evidence* (1930). The crime of murder was divided into two classes, in some

---

the result of a Code prepared by Judge Cox and enacted in 1901. 31 Stat. 1189, 1321. In an historical note that precedes the Code, Judge Cox stated that it was to have been based on the laws of Maryland. District of Columbia Code (1940 ed.) xiv. In a letter to the Washington Board of Trade, however, Judge Cox stated that the Code was based on the laws of Maryland, Virginia, New York, and Ohio. *Report of the Washington Board of Trade,* November 14, 1898, pp. 23–24. And the Washington *Law Reporter,* vol. 26, p. 801, states that the "portions of the work relating to crimes and punishments follow the statutes of New York in creating degrees in the crime of murder." A comparison of the Code with the New York Penal Code of 1898, §§ 183, 183a, 184, bears out this statement, though the exact language of the New York statute was not adopted.

The reports of each of the four States, however, up to the time of the enactment of the District Code, indicates unanimity in one essential element. For a homicide to constitute murder in the first degree, the jury must find in addition to the element of intent to kill, premeditation and deliberation. *E. g., Spencer* v. *State,* 69 Md. 28 (1888); *Leighton* v. *People,* 88 N. Y. 117 (1882); *People* v. *Majone,* 91 N. Y. 211 (1883); *People* v. *Conroy,* 97 N. Y. 62 (1884); *People* v. *Hawkins,* 109 N. Y. 408, 17 N. E. 371 (1888); *People* v. *Barberi,* 149 N. Y. 256, 43 N. E. 635 (1896); *Ohio* v. *Neil,* Tappan (Ohio) 120 (1817); *State* v. *Turner,* Wright (Ohio) 20 (1831); *State* v. *Gardiner,* Wright (Ohio) 392 (1833); *State* v. *Thompson,* Wright (Ohio) 617 (1834); *Shoemaker* v. *State,* 12 Ohio 43 (1843); *Ohio* v. *Brooks,* 1 Ohio Dec. 407 (1851); *Fouts* v. *State,* 8 Ohio St. 98 (1857); *State* v. *Cook,* 2 Ohio Dec. 36 (1859); *Burns* v. *State,* 3 Ohio Dec. 122 (1859); *State* v. *Maxwell,* Dayton (Ohio) 362 (1867); *Zeltner* v. *State,* 32 Ohio C. C. 102 (1899); *Commonwealth* v. *Jones,* 1 Leigh (Va.) 598 (1829); *Dejarnette* v. *Commonwealth,* 75 Va. 867 (1881); *Hite* v. *Commonwealth,* 96 Va. 489, 31 S. E. 895 (1898); *Jackson* v. *Commonwealth,* 97 Va. 762, 33 S. E. 547 (1899).

States very early,[7] in recognition of the fact that capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation. It is this consideration that has led most of the States to divide common law murder into two crimes, and Congress followed this legislation. See Michael and Wechsler, *A Rationale of the Law of Homicide* (1937) 37 Col. L. Rev. 701, 703–704; Michael and Wechsler, *Criminal Law and Its Administration* (1940) 1269 *et seq.*

The bite of law is in its enforcement. This is especially true when careful or indifferent judicial administration has consequences so profound as does the application of legislation dividing murder into first and second degrees—consequences that literally make the difference between life and death. This places the guiding responsibility upon the trial court in no wise restricted by the course pursued by the defense. The preoccupation at the trial, in the treatment of the conviction by the court below and by the arguments at the bar of this Court, was with alluring problems of psychiatry. Throughout this melancholy affair the insistence was on claims of Fisher's mental deficiencies and the law's duty to take into consideration the skeptical views of modern psychiatry regarding the historic legal tests for insanity. I cannot but believe that this has diverted attention from the more obvious and conventional but controlling inquiry regarding the ab-

---

[7] Pennsylvania enacted this type of legislation in 1794. Pennsylvania Laws, 1794, c. 257, §§ 1–2. This early statute has served as the pattern upon which most legislative action with a similar purpose has been based. See Michael and Wechsler, *A Rationale of the Law of Homicide* (1937) 37 Col. L. Rev. 701, 703–704; Michael and Wechsler, *Criminal Law and Its Administration* (1940) 1270–73. The District Code does not depart very far from the language of the original Pennsylvania statute; nor did the statute of the Territory of Utah construed by this Court in *Hopt* v. *People,* 104 U. S. 631, 632.

sence or presence of the requisite premeditation, under the circumstances of this case.

That the charge requested by the defendant and denied did not go to this issue of premeditation unambiguously but in an awkward and oblique way did not lessen the responsibility of the trial judge to bring this issue—it was the crucial issue—sharply and vividly to the jury's mind. If their minds had been so focused, the jury might well have found that the successive steps that culminated in Miss Reardon's death could not properly be judged in isolation. They might well have found a sequence of events that constituted a single, unbroken response to a provocation in which no forethought, no reflection whatever, entered. A deed may be gruesome and not be premeditated. Concededly there was no motive for the killing prior to the inciting "you black nigger." The tone in which these words were uttered evidently pulled the trigger of Fisher's emotions, and under adequate instructions the jury might have found that what these words conveyed to Fisher's ears unhinged his self-control. While there may well have been murder, deliberate premeditation, for which alone Congress has provided the death sentence, may have been wanting.[8] "While it is unlikely that the jury would

---

[8] Federal judges are not referees in sporting contests. Their duty to keep a trial in the course of justice is especially compelling where the penalty for conviction is death. The kind of guidance that a trial judge should give a jury in a case like this is well illustrated by Judge Andrews in *People* v. *Caruso*, 246 N. Y. 437, 159 N. E. 390. *E. g.*, "But was there premeditation and deliberation? . . . Time to deliberate and premeditate there clearly was. Caruso might have done so. In fact, however, did he?

"Until the Saturday evening Caruso had never met Dr. Pendola. Nothing occurred at that interview that furnished any motive for murder. Then came nervous strain and anxiety culminating in grief, deep and genuine, for the death of his child. Brooding over his loss,

return a verdict of murder in the first degree unless satisfied that the defendant, at the time he committed the offense, was capable of entertaining the malicious intent, we cannot, in a case of this kind, speculate as to what considerations entered into their verdict." *Sabens* v. *United States,* 40 App. D. C. 440, 444. The same guiding consideration for reviewing a death sentence was pithily expressed the other day by the present Lord Chief Justice of England: "It is impossible to say what verdict would have been returned had the case been left to the jury with a proper direction." *Kwaku Mensah* v. *Rex,* [1946] A. C. 83, 94. In that case, the Privy Council found inadequacy in the direction given by the trial court on considerations that were not mentioned in the courts below nor raised by the appellant. Neither should we permit a death sentence to stand that raises such doubts as does Fisher's conviction on this record.

As I have already indicated, I do not believe that the facts warrant a finding of premeditation. But, in any event, the justification for finding first-degree murder pre-

---

blaming the doctor for his delay in making the promised visit, believing he had killed the boy by his treatment, the doctor finally enters. And when told of the child's death he appears to laugh. This added to his supposed injuries would fully account for the gust of anger that Caruso says he felt. Then came the struggle and the homicide.

"As has been said, Caruso had the time to deliberate, to make a choice whether to kill or not to kill—to overcome hesitation and doubt—to form a definite purpose. And where sufficient time exists very often the circumstances surrounding the homicide justify—indeed require—the necessary inference. Not here, however. No plan to kill is shown, no intention of violence when the doctor arrived—only grief and resentment. Not until the supposed laugh did the assault begin. . . . The attack seems to have been the instant effect of impulse. Nor does the fact that the stabbing followed the beginning of the attack by some time affect this conclusion. It was all one transaction under the peculiar facts of this case. If the assault was not deliberated or premeditated then neither was the infliction of the fatal wound." 246 N. Y. at 445–46.

meditation was so tenuous that the jury ought not to have been left to founder and flounder within the dark emptiness of legal jargon.[9] The instructions to the jury on the vital issue of premeditation consisted of threadbare generalities, a jumble of empty abstractions equally suitable for any other charge of murder with none of the elements that are distinctive about this case, mingled with talk about mental disease. What the jury got was devoid of clear guidance and illumination. Inadequate direction to a jury may be as fatal as misdirection. The observations made by this Court in a civil case are especially pertinent to the duty of a federal judge in a trial for murder: ". . . it is the right and duty of the court to aid [the jury] . . . by directing their attention to the most important facts, . . . by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts and their combined effect, stripped of every consideration which might otherwise mislead or confuse them. . . . Constituted as juries are, it is frequently impossible for them to discharge their function wisely and well without this aid. In such cases, chance, mistake, or caprice, may determine the result." *Nudd* v. *Burrows,* 91 U. S. 426, 439.

Only the other day we exercised our supervisory responsibility over the lower federal courts to assure against the possibility of unfairness in the operation of the jury system

[9] ". . . It is not too much to say of any period, in all English history, that it is impossible to conceive of trial by jury as existing there in a form which would withhold from the jury the assistance of the court in dealing with the facts. Trial by jury, in such a form as that, is not trial by jury in any historic sense of the words. It is not the venerated institution which attracted the praise of Blackstone and of our ancestors, but something novel, modern, and much less to be respected.

"In the Federal courts the common-law doctrine on this subject has always held." Thayer, *Preliminary Treatise on Evidence* (1898) 188, n. 2.

in ordinary civil suits. *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217. By how much more should we guard against a fatal mishap where life is at stake. This Court in reviewing a conviction for murder in the federal courts ought not to be behind the House of Lords and the Privy Council in rejecting strangling technicalities. See *Mancini* v. *Director of Public Prosecutions*, [1942] A. C. 1, 7–8; [10] *Kwaku Mensah* v. *Rex, supra.* It should be guided, as was the Privy Council in the case of a lowly West African villager, by broad considerations of justice so as to avoid

---

[10] "Although the appellant's case at the trial was in substance that he had been compelled to use his weapon in necessary self-defence—a defence which, if it had been accepted by the jury, would have resulted in his complete acquittal—it was undoubtedly the duty of the judge, in summing up to the jury, to deal adequately with any other view of the facts which might reasonably arise out of the evidence given, and which would reduce the crime from murder to manslaughter. The fact that a defending counsel does not stress an alternative case before the jury (which he may well feel it difficult to do without prejudicing the main defence) does not relieve the judge from the duty of directing the jury to consider the alternative, if there is material before the jury which would justify a direction that they should consider it. Thus, in *Rex* v. *Hopper* [(1915) 2 K. B. 431], at a trial for murder the prisoner's counsel relied substantially on the defence that the killing was accidental, but Lord Reading C. J., in delivering the judgment of the Court of Criminal Appeal, said [*id.* at 435]: 'We do not assent to the suggestion that as the defence throughout the trial was accident, the judge was justified in not putting the question as to manslaughter. Whatever the line of defence adopted by counsel at the trial of a prisoner, we are of opinion that it is for the judge to put such questions as appear to him properly to arise upon the evidence, even although counsel may not have raised some question himself. In this case it may be that the difficulty of presenting the alternative defences of accident and manslaughter may have actuated counsel in saying very little about manslaughter, but if we come to the conclusion, as we do, that there was some evidence—we say no more than that—upon which a question ought to have been left to the jury as to the crime being manslaughter only, we think that this verdict of murder cannot stand.' "

the mistake of affirming a death sentence which the jury may well not have returned had they had a direction that would have informed their understanding and guided their judgment. In the circumstances of this case, failure to charge the jury adequately was to deny Fisher the substance of a fair trial.

Men ought not to go to their doom because this Court thinks that conflicting legal conclusions of an abstract nature seem to have been "nicely balanced" by the Court of Appeals for the District of Columbia. The deference which this Court pays to that Court's adjudications in ordinary cases involving issues essentially of minor or merely local importance seems out of place when the action of this Court, no matter how phrased, sustains a death sentence at the seat of our Government as a result of a trial over which this Court, by direction of Congress, has the final reviewing power. This Court cannot escape responsibility for the death sentence if it affirms the judgment. One can only hope that even more serious consequences will not follow, which would be the case if the Court's decision were to give encouragement to doctrines of criminal law that have only obscurantist precedents of the past to recommend them. Moreover, a failure adequately to guide a jury on a basic issue, such as that of premeditation on a charge of murder in the first degree, does not reflect a "long established" practice, and one hopes will not become "deeply rooted," in the District.[11]

---

[11] The only authority adduced for what the Court terms long-established practice is *United States* v. *Lee*, 4 Mackey (D. C.) 489 (1886). But that case was decided while common law murder was the law of the District. The enactment of the Code rendered that case's doctrine invalid. Counsel for the Government, a distinguished lawyer, Mr. A. S. Worthington, pointed to the distinction in his argument: "In jurisdictions where murder is divided into two degrees—murder in the first degree requiring deliberation and premeditation; in other words, actual malice—it has been frequently held that evidence of mental

Quite the contrary standard is indicated by an earlier opinion of the Court of Appeals. See *McAffee* v. *United States,* 70 App. D. C. 142, 105 F. 2d 21, 26.

The judgment should be reversed and a new trial granted.

Mr. Justice Murphy, dissenting.

As this case reaches us, we are not met with any question as to whether petitioner killed an individual. That fact is admitted. Our sole concern here is with the charge given to the jury concerning the elements entering into the various degrees of murder for which petitioner could be convicted.

The rule that this Court ordinarily will refrain from reviewing decisions dealing with matters of local law in the District of Columbia is a sound and necessary one. But it is not to be applied without discretion. Like most rules, this one has its exceptions. And those exceptions are grounded primarily in considerations of public policy and of sound administration of justice.

In the past, this Court has seen fit to determine various common law issues affecting only the District of Columbia. *Aldridge* v. *United States,* 283 U. S. 308; *Reed* v. *Allen,* 286 U. S. 191; *Best* v. *District of Columbia,* 291 U. S. 411. It has also, on occasion, settled issues involving the interpretation of provisions of the District of Columbia Code.

excitement resulting from drunkenness and, perhaps, also of other abnormal conditions of the mind not amounting to insanity, may reduce an unprovoked homicide to murder in the second degree; but it has always been held that such evidence cannot of itself reduce the crime to manslaughter." *Id.* at 493. The change wrought by Congress is reflected in *Sabens* v. *United States,* 40 App. D. C. 440; *Bishop* v. *United States,* 71 App. D. C. 132, 107 F. 2d 297; *Bullock* v. *United States,* 74 App. D. C. 220, 122 F. 2d 213, 214.

*Washington Fidelity Ins. Co.* v. *Burton,* 287 U. S. 97; *Loughran* v. *Loughran,* 292 U. S. 216; *District of Columbia* v. *Murphy,* 314 U. S. 441. In many respects, however, the problem in this instance far transcends the ones presented in those cases.

Here we have more than an exercise in statutory construction or in local law. It is a capital case involving not a question of innocence or guilt but rather a consideration of the proper standards to be used in judging the degree of guilt. What the Court says and decides here today will affect the life of the petitioner as well as the lives of countless future criminals in the District and in the various states. However guarded may be the Court's statements, its treatment of petitioner's claims will have inevitable repercussions in state and federal criminal proceedings. Moreover, these claims, whatever their merit, afford a rare opportunity to explore some of the frontiers of criminal law, frontiers that are slowly but undeniably expanding under the impact of our increasing knowledge of psychology and psychiatry. These factors are more than sufficient to warrant a full and careful consideration of the problems raised by this case.

The issue here is narrow yet replete with significance. Stated briefly, it is this: May mental deficiency not amounting to complete insanity properly be considered by the jury in determining whether a homicide has been committed with the deliberation and premeditation necessary to constitute first degree murder? The correct answer, in my opinion, was given by this Court more than sixty years ago in *Hopt* v. *People,* 104 U. S. 631, 634, when it said, "But when a statute establishing different degrees of murder requires deliberate premeditation in order to constitute murder in the first degree, the question whether the accused is in such a condition of mind, by reason of drunkenness *or otherwise,* as to be capable of deliberate

premeditation, necessarily becomes a material subject of consideration by the jury." (Italics added.)

The existence of general mental impairment, or partial insanity, is a scientifically established fact. There is no absolute or clear-cut dichotomous division of the inhabitants of this world into the sane and the insane. "Between the two extremes of 'sanity' and 'insanity' lies every shade of disordered or deficient mental condition, grading imperceptibly one into another." Weihofen, "Partial Insanity and Criminal Intent," 24 Ill. L. Rev. 505, 508.

More precisely, there are persons who, while not totally insane, possess such low mental powers as to be incapable of the deliberation and premeditation requisite to statutory first degree murder. Yet under the rule adopted by the court below, the jury must either condemn such persons to death on the false premise that they possess the mental requirements of a first degree murderer or free them completely from criminal responsibility and turn them loose among society. The jury is forbidden to find them guilty of a lesser degree of murder by reason of their generally weakened or disordered intellect.

Common sense and logic recoil at such a rule. And it is difficult to marshal support for it from civilized concepts of justice or from the necessity of protecting society. When a man's life or liberty is at stake he should be adjudged according to his personal culpability as well as by the objective seriousness of his crime. That elementary principle of justice is applied to those who kill while intoxicated or in the heat of passion; if such a condition destroys their deliberation and premeditation the jury may properly consider that fact and convict them of a lesser degree of murder. No different principle should be utilized in the case of those whose mental deficiency is of a more permanent character. Society, moreover, is ill-protected by a rule which encourages a jury to acquit a partially insane person with an appealing case simply because

his mental defects cannot be considered in reducing the degree of guilt.

It is undeniably difficult, as the Government points out, to determine with any high degree of certainty whether a defendant has a general mental impairment and whether such a disorder renders him incapable of the requisite deliberation and premeditation. The difficulty springs primarily from the present limited scope of medical and psychiatric knowledge of mental disease. But this knowledge is ever increasing. And juries constantly must judge the baffling psychological factors of deliberation and premeditation, Congress having entrusted the ascertainment of those factors to the good sense of juries. It seems senseless to shut the door on the assistance which medicine and psychiatry can give in regard to these matters, however inexact and incomplete that assistance may presently be. Precluding the consideration of mental deficiency only makes the jury's decision on deliberation and premeditation less intelligent and trustworthy.

It is also said that the proposed rule would require a revolutionary change in criminal procedure in the District of Columbia and that this Court should therefore leave the matter to local courts or to Congress. I cannot agree. Congress has already spoken by making the distinction between first and second degree murder turn upon the existence of deliberation and premeditation. It is the duty of the courts below to fashion rules to permit the jury to utilize all relevant evidence directed toward those factors. But when the courts below adopt rules which substantially impair the jury's function in this respect, this Court should exercise its recognized prerogative.

If, as a result, new rules of evidence or new modes of treatment for the partly defective must be devised, our system of criminal jurisprudence will be that much further enlightened. Such progress clearly outweighs any temporary dislocation of settled modes of procedure.

Only by integrating scientific advancements with our ideals of justice can law remain a part of the living fiber of our civilization.

Mr. Justice Frankfurter and Mr. Justice Rutledge join in this dissent.

Mr. Justice Rutledge, dissenting.

A revolting crime, such as was committed here, requires unusual circumspection for its trial, so that dispassionate judgment may have sway over the inevitable tendency of the facts to introduce prejudice or passion into the judgment. This means that the accused must not be denied any substantial safeguard for control of those influences. A trial for a capital offense which falls short of that standard, although unwittingly, does not give him his due.

Congress introduced the requirements of premeditation and deliberation into the District of Columbia Code, Title 22, §§ 2401, 2404, in 1901. 31 Stat. 1321, with which compare Rev. Stat. § 5339. I do not think it intended by doing so to change the preexisting law only in cases of intoxication. Hence, I cannot assent to the view that the instructions given to the jury were adequate on this phase of the case. I think the defendant was entitled to the requested instruction which was refused or one of similar import.

I have no doubt that the trial court declined to give it believing that it was not required, perhaps also that it would be erroneous. For the fair-minded and able assistant district attorney who argued the case here conceded, with characteristic candor, that the courts of the District have consistently limited the effect of the controlling Code provision, by way of changing the preexisting law, to cases of intoxication. But, for the reasons in the opinion of Mr. Justice Murphy, I do not think Congress intended the change to be restricted so narrowly. Accordingly I join in that opinion.

Apart from this defect, the instructions given were correct as far as they went. They were however in wholly abstract form, which in some cases might be sufficient. But the issues of premeditation and deliberation were crucial here on the question of life or death. A more adequate charge, I agree with MR. JUSTICE FRANKFURTER, would have pointed up the evidence, at least in broad outline, in relation to those issues.

Because I think the charge was deficient in not including the requested instruction or one substantially similar, thus in my opinion failing to meet the standard set by Congress in the Code, and because the effect of this deficiency was magnified by the failure to point up the instructions given in some more definite relation to the evidence, I think the judgment should be reversed.